**OMNIPOINT COMMUNICATIONS, INC., Plaintiff,**

v.

**COMMON COUNCIL OF THE CITY OF PEEKSKILL, the City of Peeks-kill and Richard Dimarzo, Director of Public Works of the City of Peekskill, Defendants.**

No. 01 CIV. 0198(CM).

United States District Court, S.D. New York.

May 14, 2002.

Lawrence Praga, Esq., Keane & Beane, P.C., for Plaintiff.

William J. Florence, Jr., Esq., for Defendants.

McMAHON, District Judge.

Omnipoint Communications, Inc. ("Omnipoint") brings this action against the Common Council of the City of Peekskill, the City of Peekskill and Richard DiMarzo, the Director of Public Works of the City of Peekskill, alleging violations of the Federal Telecommunications Act of 1996, 47 U.S.C. § 332 (the "TCA") and Article 78 of the New York Civil Practice Laws and Rules for the Common Council's denial of Omnipoint's application for a special permit to install a personal wireless service facility (three rooftop antennas and a small equipment cabinet) atop River House, a residential apartment building located at 150 Overlook Avenue, Peekskill, New York.

Omnipoint alleges a violation of Section 704 of the TCA, 47 U.S.C. § 332(c)(7)(B)(i)(I), alleging that the defendants unreasonably discriminated among providers of functionally equivalent services (Count 1); a violation of 47 U.S.C. § 332(c)(7)(B)(ii) alleging that the defendants caused unreasonable delay in their processing of Omnipoint's application (Count 2); a violation of 47 U.S.C. 332(c)(7)(B)(iii) alleging that the Common Council's decision was not supported by substantial evidence (Count 3); a violation of 47 U.S.C. 332(c)(7)(B)(iv) alleging that defendants impermissibly based their decision on the basis of the unsupported fears of local residents with respect to radio frequency emissions from the facility (Count 4). Omnipoint also alleges a violation of Article 78 of the Civil Practice Laws and Rules of New York, N.Y. CPLR § 7803(4) (Count 5), and the Peekskill Zoning Code, Section 300–56 for impermissibly amending the Zoning Code by substituting the Common Council for the Director of Public Works as the officer that issues special permits (Count 6). Omnipoint seeks injunctive relief vacating, annulling and setting aside Common Council's Resolution denying Omnipoint's application, and further requests this Court to direct the issuance of a Special Permit, building permits and any other permits, approvals or licenses necessary for erection and construction of the Facility. Omnipoint also sues for declaratory relief, costs and attorney's fees.

Omnipoint moves for summary judgment under Counts 1, 2, 3, 5 and 6 of its Complaint. No motion was made as to Count 4. For the reasons stated below, plaintiff's Motion for Summary Judgment is granted.

## FACTS PERTINENT TO THE MOTION

A. *Local Rule 56.1 and Fed.R.Civ.P. 56(e)*

Omnipoint argues that all of the facts set forth in its Rule 56.1 statement should be deemed admitted because defendants have not submitted a response to Omnipoint's statement of facts. Omnipoint further argues that paragraphs 3–9, 11–18 and 20–21 of Defendants' Affirmation in Opposition contravenes Fed.R.Civ.P. 56(e), and should be stricken.

Rule 56.1 of the Local Civil Rules of the United States District Courts for the Southern and Eastern Districts of New York ("Local Rule 56.1") requires a party moving for summary judgment to submit "a separate, short and concise statement" setting forth material facts as to which there is no genuine issue to be tried. Local Rule 56.1(a). A party opposing summary judgment must respond with a statement of facts, containing citations to admissible evidence as to which a triable issue remains. Local Rule 56.1(b) & (d). The facts set forth in a moving party's statement "will be deemed admitted unless controverted" by the opposing party's

statement. Local Rule 56.1(c); *Omnipoint Communications, Inc. v. City of White Plains,* 175 F.Supp.2d 697, 700 (S.D.N.Y.2001).

■ Defendants have failed to respond to plaintiff's Rule 56.1 Statement of Material Facts. Therefore, the facts set forth in Omnipoint's Rule 56.1 Statement are deemed admitted by defendants.

■ Fed.R.Civ.P. 56(e) provides that "opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to matters stated therein." An attorney's affidavit which is not based on personal knowledge of the relevant facts should be accorded no weight on a motion for summary judgment. *See Wyler v. United States,* 725 F.2d 156, 160 (2d Cir.1983). When an attorney's affirmation does not comply with Rule 56(e), the court should strike the portions thereof which are not made upon the affiant's personal knowledge, contain inadmissible hearsay or make conclusory statements. *See Hollander v. American Cyanamid Co.,* 172 F.3d 192, 198 (2d Cir.), *cert. denied,* 528 U.S. 965, 120 S.Ct. 399, 145 L.Ed.2d 311 (1999); *United States v. Private Sanitation Industry Assoc. of Nassau/Suffolk, Inc.,* 44 F.3d 1082, 1084 (2d Cir.), *cert. denied sub nom,* 516 U.S. 806, 116 S.Ct. 50, 133 L.Ed.2d 15 (1995).

William Florence, Esq. submitted an affidavit—the only submission in response to plaintiff's motion—in opposition to plaintiff's motion for summary judgment. This affidavit is filled with conclusory statements of law and fact that could not be in Mr. Florence's personal knowledge, and are not supported by factual evidence. Paragraphs 3—9, 11—18 and 20—21, to the extent that they contain conclusory statements of law or information not possibly based on personal information, are stricken and will be disregarded.

**B.   Pertinent Facts**

The facts set forth below are taken from plaintiff's Rule 56.1 statement. Nonetheless, they will be viewed in a light most favorable to defendants, the non-moving party.

Omnipoint is a provider of wireless telecommunication services, licensed by the Federal Communications Commission to construct, maintain and operate a Personal Communications Service ("PCS") system nationwide and, more particularly, in the New York metropolitan area including Westchester County.

Defendant, Common Council of the City of Peekskill ("Common Council"), is the duly organized legislative and governing body of the City of Peekskill, with the responsibility for approving and authorizing special permits for public utility installations within the City of Peekskill, New York.

Defendant, Richard DiMarzo, is the duly appointed Director of Public Works of Peekskill, with the responsibility and statutory authority to issue special permits, upon the authorization of Common Council, and to issue building permits.

**1.   Special Permit Application Process**

Under the provisions of the Peekskill Zoning Code that governed Omnipoint's special permit application, the filing of a site plan application marks the first step in the approval process. Next, an applicant, such as Omnipoint, is required to seek a determination from the City of Peekskill Zoning Board of Appeals that no other reasonable location in a less restricted zoning district could be used for the proposed installation. 56.1 Stmt. ¶ 8. An applicant is then required to seek a recommendation from the Peekskill Planning Commission

concerning the issuance of a special permit. Thereafter, an applicant is required to appear before the Common Council to obtain approval for issuance of a special permit. 56.1 Stmt. ¶ 9.

This sequence of applications and approvals are referenced in Peekskill Zoning Code § 300–23(C). Although the statute has since been amended, it formerly provided as follows:

> Uses subject to the issuance of a Common Council special permit. The following uses are permitted subject to the issuance of a special permit by the Director of Public Works upon authorization by the Common Council in accordance with the provisions of § 300–55 herein and subsequent approval by the Planning Commission of a site plan in accordance with the provisions of § 300–54 herein:

> (3) Public utility installations which are needed to serve the city or the immediate neighborhood, subject to a determination by the Board of Appeals that no other reasonable location in a less restricted district can be used for the purpose contemplated, and subject, further, to such conditions as the Planning Commission may deem to be appropriate for the protection of adjoining uses and of the character of the district.

If the Common Council approves the issuance of a special permit, then the applicant returns to the Planning Commission to seeks final site plan approval. Once all of these steps are successfully completed, an applicant may then obtain a special permit from the Director of Public Works. *See* Peekskill Zoning Code § 300–55(A). With a special permit secured, an applicant may then submit the necessary construction drawings to the Department of Public Works and apply for a building permit. *See* Peekskill Zoning Code § 300–47(A) and (D).

Omnipoint claims that other telecommunication providers in the City of Peekskill that have leased space for their wireless facilities on municipal property have not been required to undertake this process. The City of Peekskill owns and maintains a parcel of property with two municipal water tanks which are known as the Forest View Water Tanks. 56.1 Stmt. ¶ 14. These 75–foot high water tanks have served as the site for a number of private wireless communications facilities. 56.1 Stmt. ¶ 15.

None of these other private wireless communications providers were required by the City of Peekskill to obtain a special permit in order to install their wireless facilities on the Forest View Water Tank site. 56.1 Stmt. ¶ 16. Instead, these wireless providers simply applied for and received building permits from the City of Peekskill. *Id.* For example, on or about October 25, 1996, the City of Peekskill and AT & T Wireless Services entered into a lease agreement for the installation of nine (9) wireless communication antennas on one of the Forest View Water Tanks. 56.1 Stmt. ¶ 17. Under the terms of the lease, AT & T Wireless Services agreed to pay the City of Peekskill a monthly rent of $2,000.00. 56.1 Stmt. ¶ 18; Lease Agreement at ¶ 4 (Pl.'s Ex. 9). AT & T Wireless Services also agreed to "donate" two (2) AT & T cellular phones to the City of Peekskill, and to further donate $80.00 per month towards their use. *See id.*

The zoning aspects of the AT & T Wireless Services application were processed "in house" by the Department of Planning and Development. 56.1 Stmt. ¶ 19; Pl.'s Ex. 10. AT & T Wireless Services did not apply for a special permit or site plan approval, but instead merely applied for a building permit.

## 2. *Omnipoint's Application for a Special Permit*

On or about December 28, 1998, Omnipoint entered into a Standard Lease Agreement with the River Ridge Owners Corp. ("RROC"), the owner of River House, for Omnipoint's installation of a personal wireless service facility atop the roof of the River House apartment building. 56.1 Stmt. ¶ 5.

Omnipoint proposed to construct a personal wireless service facility at River House. This proposed facility would not require the construction of a monopole or other tall structure on which antennas would be mounted. Omnipoint's installation of antennas on top of the roof of the existing, eight-story building would have little or no visual effect. 56.1 Stmt. ¶ 4; Pl.'s Decl. ¶¶ 3–4.

Thereafter, on January 15, 1999, the President of RROC, William J. Proceller, executed a Letter of Authorization on behalf of RROC authorizing Omnipoint to apply for all necessary permits and approvals in connection with the River House installation. 56.1 Stmt. ¶ 6. On or about June 28, 1999, after discussions with Peekskill's Department of Planning and Development, Omnipoint filed an Application For Site Plan Review, together with other documentation, drawings and the requisite application fee, with said Department. 56.1 Stmt. ¶ 7.

As Omnipoint moved through the initial stages of the approval process, its application received favorable recommendations. By letter determination dated October 21, 1999, the City of Peekskill Zoning Board of Appeals concluded that Omnipoint's proposed River House wireless installation "could not be located in a less restricted district and provide the same level of service to the City of Peekskill..." 56.1 Stmt. ¶ 20; Pl.'s Ex. 13.

## 3. *Common Council's Review of Omnipoint's Special Permit Application*

Thereafter, during a public meeting held on November 9, 1999, the City of Peekskill Planning Commission reviewed Omnipoint's application and voted unanimously to issue a favorable recommendation to the Peekskill Common Council. 56.1 Stmt. ¶ 21; Pl.'s Ex. 14. By letter dated November 9, 1999, the City of Peekskill Planning Commission transmitted its favorable recommendation to the Common Council. Pl.'s Ex. 15. Specifically, the Planning Commission advised the Peekskill Common Council that "based on discussions held during the meeting and pursuant to Staff recommendation, the Planning Commission voted to *recommend approval* of the requested Special Permit." 56.1 Stmt. ¶ 22; Pl.'s Ex. 22 (emphasis in original).

On January 24, 2000, seven months after Omnipoint filed its special permit application, Peekskill Common Council opened and closed a public hearing with respect to Omnipoint's special permit application. 56.1 Stmt. ¶ 23. John Kelly, Mayor of the City of Peekskill and member of the Common Council, explained that there was little discussion at the public hearing with respect to Omnipoint's application, and none of the residents of River House appeared at the hearing to comment. 56.1 Stmt. ¶ 24. A proposed Resolution approving Omnipoint's application was annexed to the public agenda, but the Common Council did not vote upon it at that time. This proposed Resolution was subject to four (4) *pro forma* conditions.

Soon after the close of the Common Council's public hearing on January 24, 2000, a number of River House residents independently contacted Mayor Kelly and other members of the Common Council to complain about Omnipoint's special permit application. 56.1 Stmt. ¶ 27. In substance,

these residents complained that they did not receive adequate notice of Omnipoint's application, and expressed concerns about possible adverse health effects from Omnipoint's wireless facility installation. 56.1 Stmt. ¶ 28. Mayor Kelly determined that the dispute warranted further review. 56.1 Stmt. ¶ 29. Another member of the Common Council, William Schmidt, served as the liaison between Common Council and the River House residents with respect to Omnipoint's special permit application. 56.1 Stmt. ¶ 30.

Shortly after the public hearing on January 24, 2000, Councilman Schmidt met privately with a group of River House residents in order to hear their complaints concerning the Omnipoint application. 56.1 Stmt. ¶ 31. This private meeting was held in the apartment of Ms. Stella Johnson, a resident of River House. Councilman Schmidt explained that, at the meeting, the River House residents expressed to him that their board of directors was keeping them in the dark about the Omnipoint proposal, and they were disturbed that they had not known about the proposal until this time. 56.1 Stmt. ¶ 32; Schmidt Dep. at 24 (Pl.'s Ex. 18). The residents also expressed concerns about the possible adverse health effects of the proposed wireless communications facility. *Id.* Councilman Schmidt never attempted to contact any members of RROC's Board of Directors or representative of Omnipoint concerning the application. 56.1 Stmt. ¶ 33.

Following the complaints of certain River House residents, the Common Council convened at least two "executive sessions" to formulate a response. 56.1 Stmt. ¶ 34. These executive sessions were closed to the general public, conducted without any notice to Omnipoint and no minutes were taken. 56.1 Stmt. ¶ 36. During these executive sessions, the Common Council agreed that it would amend the Resolution

it had proposed in connection with the January 24, 2000 public hearing, and added more conditions designed to discover information about the contractual relationship between Omnipoint and RROC. 56.1 Stmt. ¶ 35; Madaffari Dep. at 11–12; Schmidt Dep. at 38–41.

By letter dated March 6, 2000, Omnipoint's counsel requested that the matter of Omnipoint's application be placed on a Common Council agenda for a determination. 56.1 Stmt. ¶ 37, Pl.'s Ex. 19. Omnipoint's letter request pointed out that under General City Law § 27–b(6), the Common Council was required to render its decision on Omnipoint's application within sixty-two (62) days after the close of its public hearing, which would be March 26, 2000 (a Sunday). 56.1 Stmt. ¶ 38, Pl.'s Ex. 19. The Common Council placed the Omnipoint matter on its agenda for March 27, 2000. 56.1 Stmt. ¶ 39.

Annexed to the public meeting calendar for March 27, 2000 was an amended version of the Resolution which the Common Council had previously proposed for the conditional approval of Omnipoint's application. In addition to the prior *pro forma* conditions however, four new conditions were added:

5. The Special Permit shall only be valid for as long as the applicant has a valid contract with the River House;

6. That other public utility facilities may co-locate at the site subject to review and approval under the City's antenna ordinance;

7. The applicant shall comply with the all [sic] section [sic] of the City of Peekskill Antenna Ordinance that was enacted on March 27, 2000; and

8. That no additional antennae or other accessory transmitting devices shall be installed nor shall the subject

facilities be sublet/subleased without specific approval by the City of Peekskill, including amendment to the Special Permit. 56.1 Stmt. ¶ 41, Pl.'s Ex. 21.

At the outset of the public meeting, the Common Council announced that it had discussed the Omnipoint application in executive session and that its originally proposed Resolution had been "substantially amended." 56.1 Stmt. ¶ 42; Pl.'s Ex. 22. The Common Council then presided over an "open microphone" session during which a number of River House residents voiced their strong opposition to the application. 56.1 Stmt. ¶ 43, Pl.'s Ex. 22.

According to the certified minutes of that session, Mayor Kelly made a number of statements indicating that the Common Council would investigate their complaints and scrutinize the contractual relationship between Omnipoint and RROC. 56.1 Stmt. ¶ 44, Pl.'s Ex. 22, at pp. 5–6, 8, 10. Councilman Schmidt made similar remarks. 56.1 Stmt. ¶ 45, Pl.'s Ex. 22. The Common Council then proceeded to adopt a resolution with a total of thirteen (13) conditions. 56.1 Stmt. ¶ 46, Pl.'s Ex. 23. In addition to the eight (8) conditions which had already been proposed by the Common Council, the March 27, 2000 Resolution, as adopted, added the following five (5) conditions:

9.  The submission of a complete copy of the fully executed contract with River House (River Ridge Cooperative Corporation);

10. A fully executed copy of the Corporate Resolution authorizing execution of the Omnipoint Contract by the Board of Directors of the River Ridge Owners Corporation in accordance with the ByLaws of the Cooperative Apartment Corporation;

11. Review of the application, at the applicant's expense, by a qualified engineer and/or consultant selected by the Common Council during Site Plan Approval by the Planning Commission;

12. Proof of Liability Insurance in an amount deemed acceptable to the Corporation Counsel; [and]

13. Proof of financial Security in an amount deemed acceptable to the Corporation Counsel.

56.1 Stmt. ¶ 47, Pl.'s Ex. 23.

Omnipoint contends that conditions 9 and 10 were added in direct response to the complaints made by certain River House residents. 56.1 Stmt. ¶¶ 48 & 49, Madaffari Dep. at 11–13 & 17–18. These conditions were discussed and agreed upon by the Common Council in executive session. 56.1 Stmt. ¶¶ 48 & 49; Madaffari Dep. at 11–13, 21–22; Schmidt Dep. at 50, 53, 55, and were recommended by Councilman Schmidt, 56.1 Stmt. ¶¶ 48 & 49; Schmidt Dep. at 55. Condition 11 required Omnipoint to pay for an independent engineer, chosen by Common Council, to review its application—notwithstanding the fact that the Common Council had just (conditionally) approved the application, and the Peekskill Planning Commission had issued a favorable recommendation for preliminary plan approval. 56.1 Stmt. ¶ 50, Pl.'s Exs. 14, 15.

By letter dated April 11, 2000, Omnipoint's counsel transmitted documentation to the Common Council which satisfied conditions 9, 12 and 13. 56.1 Stmt. ¶ 51, Pl.'s Ex. 24. Omnipoint nevertheless maintained that the Common Council had no authority or jurisdiction to evaluate the legal relationship between Omnipoint and RROC in connection with Omnipoint's special permit application. *Id.* Omnipoint objected to condition 11, which belatedly required Omnipoint to retain an engineer to review its application. *Id.*

By letter dated May 8, 2000, Omnipoint's counsel transmitted documentation to the Common Council which satisfied condition 10. 56.1 Stmt. ¶ 52, Pl.'s Ex. 25. Specifically, Omnipoint provided the Common Council with a copy of duly executed corporate minutes reflecting that RROC's Board of Directors had decided to reaffirm the Omnipoint lease. 56.1 Stmt. ¶ 53; Pl.'s Ex. 25. The minutes, which were redacted to preserve the confidentiality of unrelated matters, confirm that William Proceller had the authority to execute the Omnipoint Lease Agreement and Letter of Authorization on behalf of RROC. 56.1 Stmt. ¶ 53. The possibility that Mr. Proceller had not been so authorized was a concern of many of the River House residents. In The May 8 letter, Omnipoint also indicated that it was prepared to retain a consultant to review its application pursuant to Condition 11.

The Common Council did not immediately respond to Omnipoint's May 8, 2000 submission. Omnipoint's counsel transmitted follow-up letters requesting such a response. 56.1 Stmt. ¶ 54, Pl.'s Ex. 26.

On July 26, 2000, City of Peekskill officials, including Mayor Kelly and Councilman Schmidt, appeared at a press conference for the purpose of publicly condemning Omnipoint's application. 56.1 Stmt. ¶ 55, Kelly Dep. at 66 (Pl.'s Ex. 16). Other council members also appeared at the press conference, including Councilpersons John Testa, Catherine Pisani and Milagros Martinez. Id.; Schmidt Dep. at 86.

During the press conference, Councilman Schmidt was critical of Omnipoint and its counsel for submitting a redacted copy of RROC's corporate minutes. 56.1 Stmt. ¶ 57; Pl.'s Decl. ¶¶ 76–77; Kelly Dep. at 69; Schmidt Dep. at 81–82. Councilman Schmidt characterized the corporate minutes as a "cut and paste job," and he stated that the document was "suspect and suspicious" and therefore would not satisfy the Common Council. 56.1 Stmt. ¶ 58; Schmidt Dep. 81. Councilman Schmidt explained that he viewed the document as "suspect" because it was signed by "George A. Thomas, Secretary" while the minutes themselves referred to a director by the name of "George Taomina." 56.1 Stmt. ¶ 59; Schmidt Dep. at 81. He later learned that, years earlier, George Taomina had legally changed his surname to "Thomas." 56.1 Stmt. ¶ 60; Schmidt Dep. at 83–84. Councilman Schmidt never made any inquiries with Omnipoint, or with RROC, with respect to the "questionable practices" he perceived. 56.1 Stmt. ¶ 61. On July 27, 2000, a newspaper article appeared in *The Journal News* titled "Peekskill Officials Accuse Wireless Firm of Sending Scrambled Signals." This article reported on the press conference. 56.1 Stmt. ¶ 62, Pl.'s Ex. 27.

By letter dated October 27, 2000, Common Council's retained consultant, Comi Telecommunications Services, reported that it had completed a review of the Omnipoint special permit application and found that Omnipoint had satisfied all requirements for issuance of a special permit. 56.1 Stmt. ¶ 63, Pl.'s Ex. 28. The letter further advised, in paragraph 4, that "[t]he conditions imposed by City [sic] Council on March 27, 2000 appear to have been met." Id. Thereafter, Omnipoint returned to the Peekskill Planning Commission and obtained final site plan approval. 56.1 Stmt. ¶ 64, Pl.'s Ex. 29.

After obtaining final site plan approval from the Planning Commission, Omnipoint's counsel wrote to Richard DiMarzo, the Director of Public Works for the City of Peekskill, and formally requested that he issue Omnipoint's special permit. 56.1 Stmt. ¶ 65, Pl.'s Ex. 30. As Director of the Department of Public Works, Richard Di-

Marzo had sole authority under the Peeks-kill Zoning Code to issue special permits once an applicant had received the requisite approvals and satisfied any accompanying conditions thereto. 56.1 Stmt. ¶ 66; Peekskill Zoning Code § 300–55(A). Furthermore, the Common Council's March 27, 2000 Resolution specifically authorized the Director of Public Works to issue Omnipoint a special permit, subject to the thirteen (13) conditions. 56.1 Stmt. ¶ 67.

When Director DiMarzo received Omnipoint's letter request, he sought guidance from City Manager James Madaffari. DiMarzo believed that the conditions for issuing the special permit had been met. 56.1 Stmt. ¶ 68; DiMarzo Dep. at 8. In response, Madaffari advised DiMarzo that he would raise the issue with the members of the Common Council. 56.1 Stmt. ¶ 69; DiMarzo Dep. at 25, 30—31.

Thereafter, the Common Council decided, without any notice to Omnipoint, to place the matter of Omnipoint's special permit application on the agenda for December 11, 2000. On that date, the Common Council convened yet another executive session to discuss how to resolve the request Omnipoint's had directed to Director DiMarzo. 56.1 Stmt. ¶ 70.

During that executive session, DiMarzo advised the members of he Common Council that, in his view, Omnipoint had satisfied all of the conditions to the Common Council's March 27, 2000 Resolution. Councilman Schmidt disagreed and expressed the opinion that the corporate minutes submitted by Omnipoint were fraudulent. 56.1 Stmt. ¶ 72; DiMarzo Dep. at 9 (Pl.'s Ex. 31). After emerging from the executive session, the Common Council adopted an Amended Resolution on December 11, 2000 declining to issue Omnipoint's special permit for failure to satisfy Condition 10. 56.1 Stmt. ¶ 73; Pl.'s Ex. 32.

The Amended Resolution first removed the Director of Public Works as the officer authorized to issue the Special Permit for Omnipoint. In his place, the Common Council substituted itself as the issuing body:

> **RESOLVED**, that the Common Council hereby amends Resolution "J5" passed on March 27, 2000, to remove the Director of Public Works from said Resolution and that the Common Council of the City of Peekskill be authorized to direct the issuance of a Special Permit for the subject and compliance application [sic] upon the submissions of items 1 through 13 as specified in Resolution "J5" adopted on March 27, 2000[.]

56.1 Stmt. ¶ 75, Pl.'s Ex. 32. The Amended Resolution further provides:

> **RESOLVED**, that the Common Council of the City of Peekskill has reviewed the submissions of the Applicant and hereby finds that all items required to be submitted have been fully complied with, *except item 10* which required submission of a fully executed copy of the Corporate Resolution authorizing execution of the Omnipoint contract by the Board of Directors of the River Ridge Owner's Corporation in accordance with the By–Laws of the Co–Operative Apartment Corporation[.]
>
> **BE IT FURTHER**
>
> **RESOLVED**, that as a result of the Applicant's failure to comply with condition 10, the Common Council of the City of Peekskill hereby declines to issue a Special Permit for the subject application.

*Id.*

Omnipoint filed the present action about a month later on January 10, 2001. Following discovery, Omnipoint filed its motion for summary judgment on December 3, 2001.

## DISCUSSION

### I. *Summary Judgment Standard*

Plaintiff moves for summary judgment on all but one of its claims. Under Rule 56(c) of the Federal Rules of Civil Procedure, the Court will grant summary judgment if the record shows that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The Court views the record in the light most favorable to the non-movant and resolves all ambiguities and draws all reasonable inferences against the movant. *See United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962); *Donahue v. Windsor Locks Bd. of Fire Commn'rs*, 834 F.2d 54, 57 (2d Cir.1987).

An issue of fact is "genuine" if it provides a basis for "a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The mere existence of disputed factual issues is not enough to defeat a motion for summary judgment. *See Knight v. United States Fire Ins. Co.*, 804 F.2d 9, 11 (2d Cir.1986), *cert. denied*, 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987). The moving party bears the initial burden of demonstrating the absence of any genuine issue of material fact. *See Consarc Corp. v. Marine Midland Bank, N.A.*, 996 F.2d 568 (2d Cir.1993) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)). This burden may be met by demonstrating that there is a lack of evidence to support the nonmoving party's claim. *See Celotex Corp.*, 477 U.S. at 325, 106 S.Ct. 2548. Once the moving party satisfies this initial burden, the nonmoving party must set forth "specific facts showing that there is a genuine issue for a trial." Fed.R.Civ.P. 56(e).

### II. *The Telecommunications Act*

In the TCA, the Federal Government imposes limitations on the "regulation of the placement, construction, and modification of personal wireless service facilities by any State or local government or instrumentality thereof." 47 U.S.C. § 332(c)(7). The TCA was intended "to provide for a pro-competitive, de-regulatory national policy framework designed to accelerate rapidly private sector deployment of advanced telecommunications and information technologies and services ... by opening all telecommunications markets to competition...." *Cellular Telephone Co. v. Town of Oyster Bay*, 166 F.3d 490, 493 (2d Cir.1999) (quoting a TCA Conference Committee report found at H.R. Conf. Rep. No. 104–458, at 206 (1996), reprinted in 1996 U.S.C.C.A.N. 124, 124).

In order to foster the growth of the telecommunications industry, Section 332 of the TCA requires, *inter alia*, that a denial of a request to build a personal wireless service facility must be "in writing and supported by substantial evidence." 47 U.S.C. § 332(c)(7)(B)(iii). Further, local governments must decide any request for authorization to construct a personal wireless service within a "reasonable period of time," 47 U.S.C. § 332(c)(7)(B)(ii), and are prohibited from "unreasonably discriminating" among providers of functionally equivalent services, 47 U.S.C. § 332(c)(7)(B)(i)(I). Omnipoint claims that defendants have clearly violated these three statutory provisions of the TCA.

### III. *Substantial Evidence (Count 3)*

### A. *The Substantial Evidence Standard*

The TCA established procedural requirements that local planning boards must comply with in their evaluation of cell

site applications. *Town of Oyster Bay*, 166 F.3d at 494. The TCA requires that denials of permits to build wireless service facilities be supported by substantial evidence. 47 U.S.C. § 332(c)(7)(B)(iii). This Court should apply "the traditional standard used for judicial review of agency actions" in its determination of whether the denial was supported by substantial evidence. *Town of Oyster Bay*, 166 F.3d at 494 (quoting H.R. Conf. Rep. No. 104–458, at 206 (1996), *reprinted in* 1996 U.S.C.C.A.N. 124, 223). The Court may neither engage in its own fact-finding nor supplant the Board's reasonable determinations. *Id.* (citing *PrimeCo Personal Communications, L.P. v. Village of Fox Lake*, 26 F.Supp.2d 1052, 1063 (N.D.Ill. 1998)).

▪ Although it is true that a district court generally defers to a zoning board's decision by not substituting its judgment for that of the Board, "it must overturn the board's decision under the substantial evidence test if it 'cannot conscientiously find that the evidence supporting the decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to the Board's view.'" *SBA Communications, Inc. v. Zoning Comm'n of the Town of Brookfield*, 112 F.Supp.2d 233, 237 (D.Conn.2000) (*quoting BellSouth Mobility, Inc. v. Gwinnett County*, 944 F.Supp. 923, 928 (N.D.Ga.1996)); *see also Town of Oyster Bay*, 166 F.3d at 494; *Omnipoint Communications, Inc. v. City of White Plains*, 175 F.Supp.2d 697 (S.D.N.Y.2001). Substantial evidence has been construed to mean less than a preponderance, but more than a scintilla of evidence. "It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera v. NLRB*, 340 U.S. 474, 477, 71 S.Ct. 456, 95 L.Ed. 456 (1951) (internal quotations omit-

ted). The record should be viewed in its entirety; that is, evidence opposed to the City of Peekskill's view must be considered as well. *American Textile Mfr. Inst., Inc. v. Donovan*, 452 U.S. 490, 523, 101 S.Ct. 2478, 69 L.Ed.2d 185 (1981). Local and state zoning laws govern the weight to be given the evidence. *Town of Oyster Bay*, 166 F.3d at 494.

In this action, Omnipoint argues that the Common Council's Resolution was not supported by substantial evidence because (1) the Common Council had no local or state legal authority to evaluate and analyze the private contractual relationship between Omnipoint and RROC; (2) the Common Council's attempt to transfer the power to issue a special permit from the Director of Public Works to the Common Council was ineffective and void; and, (3) the Resolution adopted by the Common Council on December 11, 2000 does not constitute a "written record" as required by the TCA.

B. *The Common Council Lacked the Legal Authority to Interfere in The Contractual Relationship Between Omnipoint and RROC*

▪ Omnipoint claims that no state or local law permitted the Common Council to interject itself into a private dispute between a dissident group of River House residents and RROC's Board of Directors. Specifically, Omnipoint argues that clearly established New York law prohibits a zoning board from withholding, denying or conditioning a special permit based on extrinsic matters beyond its purview.

"The classification of a use as one that is permitted in a particular district subject to the granting of a [special] permit is tantamount to a legislative finding that, if the conditions of the zoning ordinance are met, the proposed use is compatible with the standards and objectives of the zoning ordinance and will not adversely affect the

neighborhood and the surrounding area." *Twin County Recycling Corp. v. Yevoli,* 224 A.D.2d 628, 628, 639 N.Y.S.2d 392, 393 (2d Dep't 1996), *aff'd,* 90 N.Y.2d 1000, 665 N.Y.S.2d 627, 688 N.E.2d 501 (1997). For this reason, "the issuance of a special permit is a duty which must be exercised whenever there is compliance with the statutory conditions." *Peter Pan Games of Bayside, Ltd. v. Board of Estimate of City of New York,* 67 A.D.2d 925, 925–26, 413 N.Y.S.2d 164, 166 (2d Dep't 1979).

In New York, cellular telephone companies, such as Omnipoint, are classified as "public utilities" for purposes of zoning applications. *See Cellular Telephone Co. v. Rosenberg,* 82 N.Y.2d 364, 604 N.Y.S.2d 895, 624 N.E.2d 990 (1993). "A zoning board of appeals has a narrower range of discretion in dealing with special-permit applications filed by utilities than is true in the case of the generality of applications." 1 Salkin, *New York Zoning Law and Practice* § 11:20, pp. 11–34 (West Group 1999).

The New York Court of Appeals has held that it is impermissible to deny a special permit based on an allegation or a claim that the approval would violate the private rights of a third party. *See Friends of the Shawangunks, Inc. v. Knowlton,* 64 N.Y.2d 387, 487 N.Y.S.2d 543, 476 N.E.2d 988 (1985); *see also Vandoros v. Hatzimichalis,* 517 N.Y.S.2d 51, 53, 131 A.D.2d 752, 754 (2d Dep't 1987); *109 Main Street Corp. v. Burns,* 14 Misc.2d 1037, 1038–39, 179 N.Y.S.2d 60, 62 (Sup.Ct. Nassau Co.1958). The New York Court of Appeals has also stated that municipal boards may not impose conditions upon the issuance of a special permit that are unrelated to the purposes of zoning. *See St. Onge v. Donovan,* 71 N.Y.2d 507, 516–17, 527 N.Y.S.2d 721, 725, 522 N.E.2d 1019 (1988). "Indeed, the cases are legion, in this State and elsewhere, which hold

that zoning in the very nature of things has reference to land rather than to owner, and that is a fundamental rule that zoning deals basically with land use and not with the person who owns or occupies it." *FGL & L Property Corp. v. City of Rye,* 66 N.Y.2d 111, 116, 495 N.Y.S.2d 321, 324, 485 N.E.2d 986 (1985) (citations and quotation marks omitted).

Finally, New York courts have held that a zoning board may not deny a special permit solely on the basis of generalized objections and concerns "which, in effect, amount to community pressure." *Twin County Recycling,* 224 A.D.2d at 629, 639 N.Y.S.2d at 393. *See also Orange and Rockland Utilities, Inc. v. Town Board of Town of Stony Point,* 214 A.D.2d 573, 574–75, 624 N.Y.S.2d 640, 642 (2d Dep't), *lv. to appeal denied,* 86 N.Y.2d 710, 634 N.Y.S.2d 443, 658 N.E.2d 221 (1995).

█ The evidence shows that the Common Council impermissibly based its rejection of plaintiff's application for a special permit on its members' subjective assessment of the contractual relationship between Omnipoint and RROC. Common Council's only stated reason for rejecting Omnipoint's application is Omnipoint's alleged "failure to comply with condition 10" which required Omnipoint to submit "[a] fully executed copy of the Corporate Resolution authorizing execution of the Omnipoint Contract by the Board of Directors of the River Ridge Owners Corporation in accordance with the Bylaws of the Cooperative Apartment Corporation." Furthermore, the Common Council made no effort to hide its efforts to "go through [the contract] line by line," and vowed to do "whatever [Common Council] can do to assist [the River House residents] in this matter." Certified Minutes, Pl.Ex. 22, at pp. 5–6. In its meager response to Omnipoint's motion for summary judgment, defendants admit that the reason that they

imposed so many late-stage conditions on Omnipoint "was a clear signal of the determination of the Council ... to bring exposure to the application." Florence Aff. ¶ 21. However, as set forth above, municipal boards may not condition the issuance of a special permit upon an allegation that an approval would violate the private rights of a third party, or based upon matters that are unrelated to the purposes of zoning. Any amount of pressure the residents of River House placed on the Common Council is irrelevant to the application process.

The Common Council's decision to deny Omnipoint's special permit application because Omnipoint allegedly failed to submit adequate documentation of the RROC Corporate Resolution was not supported by "substantial evidence" when viewed in the light of the entire record. *SBA Communications, Inc. v. Zoning Comm'n of the Town of Brookfield,* 112 F.Supp.2d at 237. Omnipoint complied fully with every merited request by the Common Council—the only notable opposition to Omnipoint's application was the vocal opposition by the angered residents of River House. However sympathetic the Common Council may have been to these residents, the residents did not present any evidence to the Common Council, let alone "substantial evidence," that (1) was related to Zoning (as opposed to matters of the private contract between Omnipoint and RROC) and (2) gave rise to a reason to deny Omnipoint's application under the TCA. It was an error of law for the Common Council to base its rejection of the application for a special permit on the basis of resident concerns over a contract between Omnipoint and RROC; the Common Council's March 27, 2000 and December 11, 2000 Resolutions cannot survive scrutiny under the substantial evidence test because they condition

and ultimately reject Omnipoint's application solely on this basis. *See Sprint Spectrum, L.P. v. Willoth,* 176 F.3d 630, 645 (2d Cir.1999) ("an agency's determination will be annulled where its determination is affected by an error of law") (*quoting WEOK Broadcasting Corp. v. Planning Board of Lloyd,* 79 N.Y.2d 373, 383, 583 N.Y.S.2d 170, 175, 592 N.E.2d 778 (1992)); *see also Townley v. Heckler,* 748 F.2d 109, 112 (2d Cir.1984) (observing that where an ALJ's determination is reviewed under a substantial evidence standard, the "[f]ailure to apply the correct legal standards is grounds for reversal.").

In support for its motion for summary judgment on Count 3, Omnipoint also argues that the December 11, 2000 Resolution be annulled on the grounds that the Common Council's attempt to transfer the power to issue a special permit from the Director of Public Works to the Common Council was ineffective and void [1], and that the Resolution does not constitute a "written record" as required by the TCA. The Court refrains from addressing these issues since I have already determined that the Resolution was not supported by substantial evidence.

## IV. *Unreasonable Delay (Count 2)*

■ The Telecommunications Act is intended to facilitate the construction of personal wireless services facilities by preventing local zoning authorities from unreasonably delaying wireless providers in the application process. *See Sprint Spectrum, L.P. v. Town of Easton,* 982 F.Supp. 47, 50 (D.Mass.1997). To that end, the TCA requires local governments to "act on any request for authorization to place, construct, or modify personal wireless facilities within a reasonable period of

---

**1.** This issue is addressed in Section VII.

224

time after the request is duly filed." 47 U.S.C. § 332(c)(7)(B)(ii).

Omnipoint alleges that the Common Council ignored this statute by delaying action on Omnipoint's application. Omnipoint filed its special permit application on or about June 24, 1999. The Common Council first acted on the application on March 27, 2000, ostensibly "approving" the application, but imposing certain conditions on it, requiring further review of Omnipoint's application, and rejected Omnipoint's application on December 11, 2000 because it did not fulfill all of these unnecessary conditions. Omnipoint alleges that the Common Council expressed open hostility to the application and engaged in further dilatory conduct by failing to place Omnipoint's application on a public agenda for a determination. Defendants claim that Omnipoint's application was acted upon on March 27, 2000, the date of the Resolution granting contingent approval. Defendants argue that March 27, 2000 was within the 62 days after the close of the public hearing as mandated by General City Law § 27–b(6).

The TCA provides that "[a]ny person adversely affected by any final action or failure to act by a state or local government . . . may . . . commence an action in any court of competent jurisdiction." 47 U.S.C. § 332(c)(7)(B)(5). While there is no question that Peekskill's Common Council has unreasonably delayed final action in Omnipoint's application—and this Court would have entered an injunction compelling immediate final action long ago had one been requested—I stated in an earlier opinion, "Congress could not have intended for plaintiff[ ] to bring a claim that a Board's action was both a final denial of [its] application and a delay that had the effect of a denial. By waiting until after the final decision was rendered, Plaintiff[ ] forwent a claim of 'unreasonable delay.'"

*New York SMSA Limited Partnership v. Town of Clarkstown*, 99 F.Supp.2d 381, 395 (S.D.N.Y.2000). Whether defendants evaded and misled Omnipoint into waiting for its final Resolution while trying to devise a way to reject its application does not raise an issue under the TCA in this instance, because Omnipoint did wait well over a year for that final resolution, thereby foregoing any claim that the Common Council acted too slowly. Therefore, I grant summary judgment, *sua sponte*, to defendants on Count 2.

V. *Unreasonable Discrimination (Count 1)*

Omnipoint alleges that defendants unreasonably discriminated against it by providing a "fast-track" application process for providers that installed wireless facilities on the municipally-owned Forest View Water Tank, while denying that advantage to other providers, like Omnipoint, that sought to utilize privately-owned property. Omnipoint also alleges that defendants unreasonably discriminated against it because the Common Council's scrutiny of the legal relationship between Omnipoint and RROC were unprecedented in the context of other applications filed in the City of Peekskill by similarly situated providers. Defendants claim (without evidentiary or legal support) that plaintiff does not support its claim of slow handling of its application with other factually similar special use permit cases. Defendants also argue that it is improper to compare Omnipoint's treatment in its application to build a personal wireless service facility on a residential co-operative corporation to the treatment of other service providers' application to build a personal wireless service facility to the City itself, because the City is exempt from "local regulation." Florence Aff. ¶ 21.

The Telecommunications Act prohibits "unreasonable" discrimination against providers of functionally equivalent services. 47 U.S.C. § 332(c)(7)(B)(i)(I). In this context, discrimination among providers may be "reasonable" when based on differing visual, aesthetic or safety concerns, or on the basis of different zoning designations applicable to a proposed antenna site. *See Willoth*, 176 F.3d at 638–39.

■ Defendants' contention that the City of Peekskill's municipally-owned buildings are not subject to local regulation in the context of building permits for personal wireless service facilities is legally unfounded. Non-governmental uses, such as the lease of space to private corporations for the construction of a personal wireless service facility, are not immune from local zoning requirements. *See Foster v. Saylor*, 85 A.D.2d 876, 447 N.Y.S.2d 75 (4th Dep't 1981) (lease by a school district, an entity immune from zoning regulations, to a private manufacturing company, was subject to the zoning regulations of the municipality); *Little Joseph Realty, Inc. v. Town of Babylon*, 51 A.D.2d 158, 164, 379 N.Y.S.2d 436, 440 (2d Dep't) ("A municipality may not engage in the business of selling its zoning exemptions to the highest bidder. Since it itself is not exempt where the contemplated activity is proprietary, it cannot immunize such activity from zoning law restrictions by transfer to a private business entity."), *appeal dismissed*, 39 N.Y.2d 827, 385 N.Y.S.2d 768, 351 N.E.2d 435 (1976); *see also* Salkin, *New York Real Property Practice*, ¶ 11:03 at p. 11–6 (West Group 2001) ("[A] municipality may not lease its property to a private company and permit the latter to establish a use which violated the zoning ordinance. Such a use is not governmental and does not share municipal immunity notwithstanding that the arrangement may be financially beneficial to the municipali-ty."). The Common Council should treat applications of providers of functionally equivalent services exactly the same in all circumstances.

■ The Common Council does not dispute that it treats applications of wireless service providers to use municipal facilities differently than applications to a corporation like the RROC. As a result, defendants admit that they unreasonably discriminate against providers of functionally equivalent services.

■ Defendants also fail to counter Omnipoint's claim that the Common Council unreasonably discriminated against it through its unprecedented scrutiny of the legal relationship between Omnipoint and RROC. Defendants do not refute that only Omnipoint was subject to such extensive application requirements and such a prolonged investigation. Defendants give no reason for such action except that the Common Council wanted to get to the bottom of Omnipoint's contractual relationship with RROC. This is not a suitable grounds for reasonable discrimination among servers. The legislative history of the TCA contemplated that *some* discrimination would occur, noting that the "unreasonable discrimination" standard "will provide localities with the flexibility to treat facilities that create different visual, aesthetic, or safety concerns differently to the extent permitted under generally applicable zoning requirements even if those facilities provide functionally equivalent services." H.R. Conf. No. 104–458, at 208, *reprinted in* 1996 U.S.C.C.A.N. at 222. The Common Council expressed no visual, aesthetic or safety concerns about Omnipoint's proposed facility; it appears that the Common Council was unduly affected by community pressure to determine whether the RROC co-op board was treating the residents of River House fairly with respect to the Omnipoint contract.

This is not a statutorily-recognized reason for treating Omnipoint differently than other applicants.

By making Omnipoint comply with numerous unprecedented conditional requests, and by providing a "fast-track" application process to other service providers who chose to rent space from the municipality, the Common Council unreasonably discriminated against Omnipoint. I grant summary judgment to plaintiff on this claim.

## VI. Article 78 Claim (Count 5)

Omnipoint also seeks summary judgment on its supplemental state law claim arising under N.Y. CPLR Article 78, which affords relief from administrative decisions that are "affected by an error of law" or not "supported by substantial evidence." N.Y. CPLR § 7803(3) and (4).

The test for "substantial evidence" in New York is essentially the same as that under the TCA. See Willoth, 176 F.3d at 646. "In final analysis, substantial evidence consists of proof within the whole record of such quality and quantity as to generate conviction in and persuade a fair and detached fact finder that, from that proof as a premise, a conclusion or ultimate fact may be extracted reasonably probatively and logically." 300 Gramatan Avenue Associates v. State Division of Human Rights, 45 N.Y.2d 176, 181, 408 N.Y.S.2d 54, 57, 379 N.E.2d 1183 (1978).

As stated above, I find that the Common Council's Amended Resolution of December 11, 2000 is not supported by substantial evidence. Rather than reach a decision based upon an impartial and reasoned analysis of Omnipoint's application, the Common Council yielded to pressure exerted by a small but vocal group of River House residents. The unlawful conditions attached to the Common Council's Resolutions of March 27, 2000 and December 11, 2000 were a byproduct of that pressure, and they cannot be sustained. Therefore, I grant Omnipoint summary judgment on its Fifth Claim.

## VII. Violation of Local Law (Count 6)

Omnipoint also alleges that the Common Council violated New York law when it purported to divest the Director of Public Works of his power to issue a special permit to Omnipoint. Plaintiff alleges that the Common Council simply ignored statutorily mandated procedures, see N.Y. General City Law § 83, as well as the strictures of its own City Code, see Peekskill Zoning Code § 300–56, in attempting to neutralize the Director of Public Works because he would not agree to withhold Omnipoint's special permit. Defendants present no response to this claim.

The Peekskill Zoning Code, § 300–55(A) provides that the Director of Public Works is the entity that has the power to issue a special permit. In order to amend § 300–55(A) so as to grant the Common Council the power to issue Omnipoint's special permit, the Zoning Code must be amended.

Section 83 of the New York General City Law provides a procedure the Common Council must follow in order to "amend the regulations and districts established under any ordinance or local law." This procedure requires the Common Council to make a motion to amend and to hold a period of public notice and public hearing. After this time, the Common Council must vote upon the amendment. A simple majority vote is sufficient if the amendment is unopposed, but an amendment that is the subject of a written protest requires the approval of at least three-fourths of the members of the council. N.Y. General City Law § 83.

Section 300–56 of the Peekskill Zoning Code provides that no amendment may be

made to the code unless on the motion of the Common Council, upon the recommendation of the Planning Commission or on petition. Peekskill Zoning Code § 300–56. The Zoning Code further provides:

> Every such proposed amendment shall be referred by the Common Council to the Planning Commission for a report before the public hearing. Unless the Planning Commission fails to render such report within forty-five (45) days after the next regularly scheduled meeting of such Commission following the time of such referral, the Common Council shall not take action on any such amendment without a recommendation from the Planning Commission.

Peekskill Zoning Code, § 300–56.

The Common Council flagrantly ignored both of these procedures when it stripped the Director of Public Works of his authority to issue a special permit to Omnipoint, and gave itself this power. In doing so, it violated both the New York General City Law and the Peekskill Zoning Code. This portion of the December 11, 2000 Resolution must be deemed null and void since it was beyond the statutory authority of the Common Council to so act. Omnipoint is entitled to summary judgment on its Sixth Claim as well.

VIII   *Omnipoint is Entitled to Injunctive Relief Directing Issuance of a Special Permit and Building Permit*

■■■   The TCA does not specify a remedy for violations of the cellular siting subsection. *See* 47 U.S.C. § 332(c)(7)(B)(v). However, the Second Circuit has held that "injunctive relief serves the [TCA's] stated goal of expediting resolution of this type of action," particularly where "remand would serve no useful purpose . . . ." *Town of Oyster Bay,* 166 F.3d at 497. *See also Iowa Wireless Services v. City of Moline,* 29 F.Supp.2d 915, 924 (C.D.Ill.1998) (or-

dering defendant to grant plaintiff a special use permit "with all deliberate speed"); *Sprint Spectrum v. Mills,* 65 F.Supp.2d 148, 161 (S.D.N.Y.1999) (directing issuance of a permit).

Through its persistent evasive conduct, its disregard of clearly established New York law and its partisan statements and actions, the Common Council has relinquished its right to seek further review of Omnipoint's application. Omnipoint's application was filed well over two years ago. Aside from the Common Council's patently improper finding that Omnipoint submitted insufficient information about its contract with RROC, it had no other objections to the issuance of a special permit. Although Omnipoint did not move for summary judgment on its claim for violation of 47 U.S.C. § 332(c)(7)(B)(iv) (improperly basing its Resolution on the basis of the environmental effects of radio frequency emissions), that claim is superfluous at this point. Defendants have clearly violated the TCA, and the delay in granting Omnipoint's permits has gone on long enough. I find that the appropriate remedy is immediate injunctive relief directing the issuance of a special permit, building permit and any other applicable permits or approvals necessary for Omnipoint to construct and operate its personal wireless service facility at River House.

**CONCLUSION**

For the reasons stated above, Omnipoint's Motion for Summary Judgment on Counts 1, 3, 5 and 6 is GRANTED. Omnipoint's Motion for Summary Judgment on Count 2 is DENIED, and this claim is dismissed *sua sponte.*

Plaintiff shall submit a proposed final judgment of injunction. If plaintiff elects not to proceed with Count 4, it should so advise the Court, and I will simply enter the judgment and close the file. If plain-

tiff wishes to pursue Count 4, I will sever that Count and enter final judgment on the remaining counts pursuant to the Fed. R.Civ.P. 54(b). There is no just reason for further delay in the entry of this injunction.