**OMNIPOINT COMMUNICATIONS, INC., d/b/a T–Mobile, and Omnipoint N.Y. MTA License, LLC, Plaintiffs,**

v.

**TOWN OF LaGRANGE, Town of LaGrange Zoning Board of Appeals, Town of LaGrange Planning Board, and Town of LaGrange Zoning and Building Department, Defendants.**

No. 08 Civ. 2201(CM)(GAY).

United States District Court, S.D. New York.

Aug. 31, 2009.

542

Gabriel Mark Nugent, Jon Patrick Devendorf, Hiscock & Barclay, LLP, New York, NY, John Donald Cook, Hiscock & Barclay, LLP, Syracuse, NY, for Plaintiffs.

Rebecca Ann Valk, Van Dewater & Van Dewater, LLP, Poughkeepsie, NY, for Defendants.

DECISION AND ORDER GRANTING IN SUBSTANTIAL PART AND DENYING IN ONE PART PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND DENYING IN SUBSTANTIAL PART AND GRANTING IN ONE PART DEFENDANTS' CROSS–MOTION FOR SUMMARY JUDGMENT AND DIRECTING THE ENTRY OF A PERMANENT INJUNCTION

McMAHON, District Judge.

Under the Telecommunications Act of 1996, 110 Stat. 56, 47 U.S.C. § 332 (hereinafter "TCA"), Congress expressed a desire to provide "for a pro-competitive, de-regulatory national policy framework designed to accelerate rapidly private sector deployment of advanced telecommunications and information technologies and services .... by opening all telecommunications markets to competition." *Cellular*

*Tel. Co. v. Town of Oyster Bay,* 166 F.3d 490, 493 (2d Cir.1999) (citing H.R. Conf. Rep. No. 104–458 at 113 (1996), 1996 U.S.Code Cong. & Admin.News. 10, 80.) In furtherance of this goal, Congress added a subsection to the National Wireless Telecommunications Siting Policy, 47 U.S.C. § 332(c)(7)(A), which imposes limits on a state or local government's decisions regarding the location, construction and modification of personal wireless facilities. *Id.* Although the TCA preserves traditional local zoning authority over the siting of wireless facilities, 47 U.S.C. § 332(c)(7)(A), "the method by which siting decisions are made is now subject to judicial oversight. Therefore, denials subject to the TCA are reviewed by [a] court more closely" than are other types of zoning decisions, to which federal courts generally accord great deference. *Id.*

Plaintiffs Omnipoint Communications, Inc., d/b/a T–Mobile, and Omnipoint N.Y. MTA License, LLC (collectively, "T–Mobile") have been attempting for some six years to fill a significant coverage gap in the Town of LaGrange. The Town has a long history of hostility to cell phone providers within its borders; the very cell tower on which plaintiffs having been trying (for five years) to co-locate the equipment that would fill the coverage gap was constructed only after a long court battle and pursuant to an order of this court (Brieant, J.). According to plaintiffs, Defendants Town of LaGrange, Town of La-Grange Zoning Board of Appeals (the "ZBA"), Town of LaGrange Planning Board (the "Planning Board"), and Town of LaGrange Planning, Zoning and Building Department (the "Building Department") (collectively referred to as the "Town")—have done everything in their power to prevent T–Mobile from co-locating on the existing tower (known as the ATC Tower), even though LaGrange's Zoning Code expresses a preference for "collocation" (the Town's spelling) over other siting solutions. Plaintiffs sue seeking an injunction to compel the Town to let it place its antennas on the ATC Tower.

Both sides have moved for partial summary judgment: plaintiffs seek a declaration that the Town Defendants, particularly the ZBA, are in violation of the TCA and of New York state law; Defendants seek dismissal of some, but not all, of the claims asserted against them.

For the reasons set forth below, plaintiffs' motion is granted except insofar as they seek summary judgment on the Ninth Cause of Action; defendants' motion is denied in all respects except insofar as they seek dismissal of the Ninth Cause of Action.

A permanent injunction directing the Town of LaGrange and any and all agencies, boards and authorities acting on its behalf to issue all necessary orders such that T–Mobile's equipment can be in service within 90 days will issue as soon as plaintiffs submit a form of order and defendants have an opportunity to comment on it.

## STATUTORY SCHEME

The TCA limits state and local regulation "of the placement, construction, and modification of personal wireless service facilities." 47 U.S.C. § 332(c)(7)(B). Such regulation "(I) shall not unreasonably discriminate among providers of functionally equivalent services, and (II) shall not prohibit or have the effect of prohibiting the provision of personal wireless services." 47 U.S.C. § 332(c)(7)(B)(i). Further, state and local government may not deny an application except in a written decision "supported by substantial evidence contained in a written record." 47 U.S.C. § 332(c)(7)(B)(iii).

## THE ADMINISTRATIVE RECORD

T–Mobile and the Town have agreed on the contents of the administrative record

that existed during the consideration of T–Mobile's collocation application, a copy of which has been jointly submitted by the parties. The Court will refer to that submission in this opinion.[1]

## STATEMENT OF FACTS

### The Code of the Town of LaGrange

Section 240–49 of the Code of the Town of LaGrange (the "Town Code") governs the siting and design of Wireless Communications Towers and Facilities. *See* LaGrange, N.Y., Town Code ch. 240, art. IV, § 240–49.

Section 240–49 expressly states that its purpose, among others, is to "[m]inimize the total number of communications towers located within the Town." *Id.* at § 240–49(A)(2). In addition, with respect to "Siting," Section 240–49 provides:

> Communications facilities *shall be sited,* to the maximum extent feasible, *on existing tall structures* such as utility poles, silos, buildings, church steeples, water tanks, and the like: Applicants must demonstrate exhaustion of all reasonable efforts to site facilities on existing structures before approval shall be granted to construct a new communications tower.

*Id* at § 240–49(F) (emphasis added). Section 240–49 also includes a sub-section entitled "Collocation," which states:

> (a) *All wireless communications facility structures should be of a type and design that will maximize collocations;*
>
> (b) *Collocation is required* of a communications facility unless the applicant has provided clear and convincing evidence that:
>
> > [1] There are no other usable existing structures in service area.
> >
> > [2] Collocation does not achieve the minimum reasonable technical needs of the proposed facility.
> >
> > [3] Structural or other engineering limitations, absent reasonable refurbishment, are clearly demonstrated to be prohibitive to the proposed facility.
> >
> > [4] After demonstrated thorough and good faith efforts, the applicant is unable to secure permission from another facility or structure owner to collocate.

*Id.* at § 240–49(G)(10) (emphasis added).

As the foregoing provisions make clear, the Town Code requires co-location of wireless services facilities in nearly every instance. An applicant may seek the installation of its facilities on something other than an existing structure *only* after overcoming significant hurdles.

There is a second provision of the Zoning Code that applies to wireless communi-

---

**1.** In the chambers file that the Court received from the staff of the late Hon. William C. Conner (upon whose death I took over this matter), there is a *dehors* the record submission, consisting of a binder full of letters written directly to Judge Conner from townspeople in LaGrange. They appear on the Court's Docket Sheet as # 43.

I do not know whether counsel for defendants submitted the letters or whether a group of citizens simply took it upon themselves to do so. However, whoever sent these letters clearly does not understand the role of the courts in our American system of government. The letters are not part of the record of proceedings that this Court is empowered to review. Rather, they are a naked attempt to lobby a judge in hopes of obtaining a favorable decision. Once I glanced at a few of the letters and apprehended the nature of the submission, the Court ceased reading them, because it would not be appropriate to consider them in reaching my decision. That decision is predicated entirely on the law and the administrative record, not on citizen pressure.

cations facilities. Section 240–49(G)(5)(b) prohibits "all communications facilities.... within 500 feet of any occupied residential dwelling unless expressly permitted, in writing, by all inhabitants of the dwelling within a radius of 500 feet of the proposed communication facility." A "wireless communications facility" is, "A term intended to include all of the various facilities that provide communications services, including tower, antenna, and any accessory structures or equipment designed and constructed for use by a commercial provider of such services." Town Code § 240–112. This provision—clearly intended to stop the construction of wireless facilities in as much of LaGrange as possible (perhaps in the entire town)—literally requires an applicant to obtain even the signatures of children (some of whom may not be able to write), or else to receive a variance from the ZBA.

The broad definition of "wireless communications facility" includes the antennas that the plaintiffs wish to install on the ACT Tower.

*The ACT Tower and Judge Brieant's Order*

This proceeding is not the first in which LaGrange has gone head to head with a wireless service provider. OmniAmerica Towers, Inc., a subsidiary of ATC, and Nextel (a competitor of T–Mobile) were forced to sue the Town after the Town denied their application for the installation of a new wireless services facility in LaGrange. ATC and Nextel had proposed to replace an existing radio tower located at 20 Vervalen Drive, on which Nextel was renting space, with a new tower on the same premises. *Nextel of N.Y., Inc. v. Town of LaGrange*, 02–civ–4260 (CLB) (S.D.N.Y. filed June 6, 2002).

This lawsuit was eventually settled by order of this court dated January 23, 2004. (R. 76–79.) The settlement provided, in pertinent part, that Nextel could construct a new monopole not to exceed 150 feet in height on the Vervalen site. The key paragraph of Judge Brieant's order for present purposes provides as follows:

> The New Tower and the Nextel Facility shall be deemed to be legal conforming uses and structures [under the Town's Zoning Code]. However, any future modifications or additions to the New Monopole or the Nextel Facility shall comply with any existing Town Zoning Code; provided however nothing in this paragraph shall be deemed a waiver of the rights of any part or a prohibition to challenge any law, code or regulation or decisions rendered there under, with respect to any future modification of additions.

(R. 78 ¶ 4.)

The wording of this paragraph insured that the settlement applied only to Nextel's installation, leaving the Town free to fight another day against any Nextel competitors who might wish to comply with Town law by co-locating wireless communications facilities on the ATC Tower. I have no doubt that Nextel was quite content with this outcome, for business reasons of its own.

Against that background, the Court examines the record in this case.

*The Town's Processing and Denial of T–Mobile's Application.*

T–Mobile is a telecommunications company providing "commercial mobile services," "personal wireless services," "commercial mobile radio services," and "personal communications services" as those terms are defined and commonly used in the TCA and in the rules, regulations and orders of the Federal Communications Commission ("FCC") promulgated pursuant thereto. T–Mobile operates a national wireless network pursuant to FCC licenses that it holds for areas including Dutchess County and the Town of LaGrange. [R. 402.]

T–Mobile provides its services in the Town of LaGrange using wireless services facilities, which include base stations, antennas and the ancillary equipment necessary to send and receive wireless signals. [R. 401.] These facilities are necessary to permit T–Mobile to provide coverage throughout a particular geographic area. [R. 401.] Wireless calls are handed off from one cell site to another as a user moves through the service area. [R. 401.] Gaps in coverage can create "gaps in service" where wireless calls cannot be initiated or received and where a wireless call in progress will be dropped. [R. 401.] Such gaps pose significant problems for wireless carriers in terms of the ability to market their services, customer goodwill, and even the satisfaction of minimum coverage requirements established by FCC regulations. [R. 401.] Given that many emergency first responder organizations rely upon wireless communications, any gaps in service also pose a public safety risk. [R. 401–402.]

At present, and for the last several years, T–Mobile has a wireless services gap that exists over a 3.5–mile area along State Route 55 in the Town of LaGrange. [R. 402, 561.] T–Mobile sought to close this gap in accordance with the terms of its FCC license through the installation of an additional wireless services facility.

On November 25, 2003, T–Mobile attended a pre-application meeting with the Town of LaGrange Planning, Zoning, and Building Department (the "Building Department") to discuss the wireless services gap and the available opportunities to close the gap by the installation of a new wireless services facility. [R. 1.] At that time, T–Mobile considered three potential options: (1) collocation of antennas on a now-existing 150–foot monopole tower owned

by American Tower Company ("ATC") and located at 20 Vervalen Drive in the Town of LaGrange (the "ATC Site"); (2) construction of a new tower located at the Redl Salvage Yard at 2 Sedgewick Road in Poughkeepsie (the "Redl Site"); and (3) collocation of antennas on a Consolidated Edison transmission tower (the "ConEd Site"). [R. 44.]

T–Mobile's initial technical analysis, performed by radio frequency engineers employed by T–Mobile using advanced scientific communications equipment, determined that collocation of antennas at the ATC Site or construction of a tower at the Redl Site would eliminate much of the gap and provide adequate and reliable coverage to the subject cell. [R. 43–44.] T–Mobile's initial technical analysis further determined that antennas at the ConEd Site would not provide the coverage necessary to eliminate the service gap. [R. 44.]

At the time T–Mobile undertook its initial technical analysis, the Nextel litigation discussed above was pending and had been pending for some time. Rather than tie its fate to a dispute over whose duration it had no control, T–Mobile made an initial decision to apply for permission to build its own tower on the Redl Site.

On or about December 30, 2003, T–Mobile submitted an application to the Building Department, requesting all necessary approvals and permits to construct a new monopole tower at the Redl Site, on which T–Mobile had acquired lease rights, with T–Mobile antennas to be located at a centerline height of 140 feet on the monopole tower (the "Redl Site Application"). [R. 15–70, 44.]

T–Mobile's Redl Site Application was supported by a 1987 variance issued by the ZBA, which allowed for the construction of a single 200–foot antenna[2] at the' Redl

2. The antenna approved by the 1987 Variance was never built. [R. 88.] I am assuming that

Site (the "1987 Variance"). [R. 33–36.] However, at an April 20, 2004 meeting of the Town of LaGrange Planning Board (the "Planning Board") concerning the Redl Site Application, T–Mobile was informed that its application to attach an antenna to any such tower would also require (among other things) either the signatures of all residents of homes within 500 feet of its antennas or a separate variance from compliance with o Section 240–49(G)(5)(b) of the Zoning Code. [R. 89.]

By that time, the Nextel lawsuit had settled. Once T–Mobile learned of the settlement, and the fact that installation of a 150–foot monopole tower at the ATC Site (the "ATC Tower") was authorized and "deemed to be [a] legal conforming use[ ] and structure[ ]," [R. 76–79.], it decided that the better part of valor was to table the Redl Site Application and instead seek to co-locate on the ATC Tower. This decision appeared wise in view of: (a) the ATC Order; (b) the Town's stated goal to minimize the number of communications towers; (c) the Town's clear mandate for the co-location on existing structures; (d) the Town's requirement that an applicant exhaust all reasonable efforts to co-locate on existing structures; (e) the Town's announcement that the installation of antennas at the Redl Site would require yet another variance; and (f) T–Mobile's technical analysis, which found that antennas at a centerline height of 138 feet on the ATC Tower would eliminate much of its service gap in the area and provide adequate and reliable wireless coverage to the subject cell. [R. 89, 166.]

T–Mobile negotiated a lease to collocate antennas at the ATC Site and began preparing the documents required to support a collocation application to the Town.

Needless to say, all this activity took time—about a year, to be precise.

On or about May 20, 2005, T–Mobile formally withdrew the Redl Site Application and submitted a new application requesting a special use permit and site plan approval from the Planning Board to collocate antennas on the ATC Tower. [R. 167–222.] On July 5, 2005, T–Mobile attended a Planning Board workshop session to discuss its application, but was told that the application could not (and therefore would not) proceed until such time as an old unused radio tower on the premises was removed and a fence constructed by ATC/Nextel pursuant to the terms of the ATC Order. [R. 241.] Needless to say, that, too, took time.

On December 20, 2005, following removal of the unused radio tower, T–Mobile attended a Planning Board meeting to discuss its Collocation Application. The Planning Board set a public hearing date for January 17, 2006. [R. 262.]

On or about January 12, 2006, T–Mobile submitted a structural analysis for the ATC Site to the Building Department, indicating that the ATC Tower could support the T–Mobile antennas, and a radio frequency compliance report, indicating that T–Mobile's installation would be in compliance with the applicable FCC rules and regulations regarding emissions. [R. 294–318.] Of particular importance, the undisputed evidence shows that the proposed installation meets FTC emissions standards. [R. 317–318].

On January 17, 2006, T–Mobile appeared before the Planning Board for a public hearing to discuss its application. [R. 330–333.] As has occurred in every one of these situations that have come before this

the Redl site is actually located in LaGrange (albeit, perhaps, with a Poughkeepsie address); otherwise, I cannot account for the

fact that the record places the Redl site in Poughkeepsie.

Court (and there have been quite a few), public comment focused on alleged concerns regarding health effects of cell towers, even though Congress has expressly provided that such concerns my not be taken into account by public officials in rendering siting decisions if a proposed installation meets FTC emissions standards—which this one does. The citizens of LaGrange also expressed extreme displeasure over the settlement of the ATC Litigation, the visual impact of the ATC Tower, the fall down area of the ATC Tower, maintenance concerns with the ATC Tower, and perceived non-compliance issues with the ATC Tower concerning the ATC Order and the Town's Code. [R. 330–333.] None of this had anything to do with T–Mobile or its application, except insofar as it demonstrate widespread local hostility to any cell tower or cellular equipment located anywhere in the Town.

In response to public comment on the purported health effects associated with cell towers, Planning Board Chairman John Brewster confirmed that the issue had come up before and that it concerned him. [R. 332.][3] However, Mr. Brewster acknowledged that the Planning Board could not deny T–Mobile's application "if it meets the code." [R. 332.]

On or about April 3, 2006, T–Mobile received a letter from the Building Department outlining concerns with T–Mobile's application, including the potential for other future collocators on the ATC Tower and aesthetic concerns that might impact the character of the neighborhood as a result of a fully collocated tower. The Building Inspector also advised T–Mobile to apply for and obtain an area variance

from Section 240–49(G)(5)(b) of the Town's Code, because the tower on which T–Mobile's proposed to install its antennas was within 500 feet of occupied residences. [R. 358–360.] T–Mobile did not have, and had no reasonable prospect of obtaining, the signatures of all the residents of those houses.

On August 3, 2007—three and one half years after the settlement of the Nextel litigation (!)—the Administrator of Planning and Zoning issued a Use Permit for Nextel to locate its equipment on the ATC Tower. [R. 375.] Four days later, on or about August 7, 2007, T–Mobile submitted a letter to the Building Department asking to appear before the Planning Board for continuation of its application. [R. 377.]

On September 4, 2007, T–Mobile appeared before the Planning Board to represent its application. [R. 378.] During the meeting, the Planning Board and the Director of the Building Department encouraged T–Mobile to consider going back to Plan A and build a new tower at the Redl Site, rather than co-locate on the ATC Tower—this despite the fact that the Town's Zoning Code effectively required T–Mobile to co-locate rather than construct a new tower. [R. 378.] In addition, the Planning Board directed T–Mobile to make an application to the ZBA for an area variance, noting that T–Mobile's proposed collocation on the ATC Tower was within 500 feet of residential dwellings and that variances were historically required for other collocation applications on existing tall structures under Section 240–49(G)(5)(b). [R. 378.]

---

**3.** The Court is not unsympathetic to the fact that long-term health effects of cell towers continue to concern the citizens of every community. Redress, however, lies in convincing Congress to allow local officials to consider health effects in their evaluation of cell pro-vider applications, even if FCC emissions standards are met. At present, local officials are expressly barred from worrying about health-related issues if—as is the case here—FCC standards for emissions are met.

T–Mobile disagreed with the Town's position that a variance was necessary, in light of the terms of the ATC Order and the fact that its antenna collocation would not change the ATC Tower setbacks. However, it made application (under protest) to the ZBA for an area variance on or about September 25, 2007. [R. 378–449.]

On November 5, 2007, T–Mobile appeared before the ZBA. It set forth its objections to the requirement for a variance from Section 240–49(G)(5)(b), but requested in the alternative the granting of the variance to allow collocation of its antennas on the ATC Tower. [R. 470–475.]

During the public hearing, the ZBA read into the record letters from the public objecting to T–Mobile's application based upon perceived health effects from cell towers (the forbidden consideration again), as well as generalized objections to the location of the ATC Tower. [R. 459–463, 471.] Public comments made during the hearing again reflected the residents' displeasure with the Town's settlement of the ATC Litigation and the installation of the ATC Tower. [R. 472–474.] ZBA member Joseph Zeidan stated that "a mistake had already been made when the tower [at the ATC Site] went up in the first place; [the ZBA does not] want to make another mistake." [R. 473.]

At no time during the November 5, 2007 meeting did the ZBA address or discuss the factors in Section 240–92(C)(2), all of which must be considered in determining a request for an area variance. Nor did the ZBA address the demonstration made by T–Mobile in support of the area variance. [R. 470–475.] Instead, the ZBA adjourned the public hearing until such time as the Planning Board issued a determination under the State Environmental Quality Review Act ("SEQRA"). [R. 475.]

On January 22, 2008, T–Mobile appeared before the Planning Board for the scheduled SEQRA public hearing. It presented photo simulations of the proposed collocation at the ATC Site. [R. 503–505, 525–532, 536–537.] T–Mobile's presentation also included updated propagation studies based on a company-wide upgrade of T–Mobile's propagation modeling tool. [R. 536–537.] The updated propagation studies re-affirmed the existence of a wireless services gap for T–Mobile that exists over a 3.5–mile area along State Route 55 and in the Town of LaGrange. [R. 536–537.]

During the meeting, the Chairman of the Planning Board acknowledged that, "The town code requires that an applicant who is proposing to put cell panels up in the town has to demonstrate to the board that co-locating on an existing tower cannot work, in order to pursue putting it on a new tower. [T–Mobile] has to apply for this on an existing tower. [The ATC Tower] will work as well as [a] tower that hasn't been built yet and since [the Redl] tower has not been built, in order for [T–Mobile] to apply for [a new tower] at all, [T–Mobile] would have to demonstrate that [the ATC Tower] won't work, [but the ATC Tower] will work" for T–Mobile. [R. 527.]

The Planning Board unanimously voted to approve a SEQRA Negative Declaration, finding that T–Mobile's project would not result in any significant adverse environmental impacts and, among other things, noted that the proposed collocation would not: (1) materially conflict with the community's current plans and goals; (2) impair the character or quality of important historical, archaeological, or aesthetic resources; or (3) create a hazard to human health. [R. 532, 592–595.]

On February 4, 2008, T–Mobile appeared before the ZBA and provided the Board with a photo simulation for the proposed collocation at the ATC Site and the revised propagation studies. [R. 553–558.] During the meeting, T–Mobile also re-stat-

ed its position that a variance from setbacks to residential structures should not be required, since T–Mobile was not changing the ATC Tower's setbacks, but merely adding antennas to the tower.[4] [R. 553.] The Building Department had already received a letter from counsel for T–Mobile, dated January 18, 2008, in which T–Mobile again asked the ZBA to (A) make a finding that no variance was in fact needed, or if it could not to (B) grant the needed variance:

(A) Given the language in the January 23, 2004 court order settling the Nextel/OmniAmerica versus Town of La-Grange law suit regarding the subject tower, and given that the proposed T–Mobile collocation does not alter, in any way, the existing court approved tower setbacks, is Zoning Code Section 240–49(G)(5)(b), requiring a 500 foot setback to the nearest residential structure, applicable to T–Mobile's collocation application?

(B) If the Zoning Board determines Section 240–49(G)(5)(b) to be applicable to T–Mobile's application, we request the Zoning Board grant the necessary setback variances to allow T–Mobile to collocate antennas on the existing tower as collocation is required by Town Zoning Code Section 240–49(G)(10).

[R. 520–523.]

The ZBA addressed the letter by flagrantly and deliberately misreading T–Mobile's request. It is, of course, the job of a Zoning Board of Appeals to determine whether a Building Inspector's ruling that a variance is needed is correct. Town Law § 240.92 (Valk Aff. Ex. C). The LaGrange Buildings Inspector had concluded that a variance was required; all T–Mobile did was ask the ZBA to conclude that he had been incorrect. Nothing could fall more squarely within the Board's mandate.

Nonetheless, the Board decided that it could not respond to T–Mobile's first request (that the Board conclude that no variance was needed) because that would require it to read Judge Brieant's order. [R. 555.] The ZBA instead focused its discussion on whether a variance should be granted. [R. 557–558.]

During the public hearing portion of the meeting, public comment again focused on the residents' anger with the Town for settling the ATC Litigation, the public's displeasure with the location of the ATC Tower, the public's concern over the ATC Tower's setbacks and fall down zone, and whether T–Mobile had a "hardship" that warranted the granting of a variance. [R. 555–557.] T–Mobile addressed the public concerns by directing the ZBA to the previously submitted structural analysis for the ATC Tower, which demonstrated that the' facility would support T–Mobile's antennas. [R. 555–557.] T–Mobile also referred the ZBA to the appropriate legal standards for granting an area variance to a public utility. [R. 555–557.] "Hardship," to the extent relevant, was established by the existence of the coverage gap and the legal impossibility of filling it in any other manner, given the Zoning Code's mandate (as noted by the Planning Board Chairman) that no new tower could be built if co-location were feasible.

However, at the conclusion of the meeting, ZBA members made the following statements:

Mr. Johnson: There is a general requirement to try to co[l]locate as much a possible but then there is a specific requirement for people within 500 feet to give their approval to a communications facility.

Ms. Swanson: I strongly believe in co[l]location, and think it is a good use of resources, however, because in this case

---

**4.** As should be evident from my comment about the Town living to fight another day,

the Court disagrees with T–Mobile's position on the need for a variance.

the tower's location is there because the court settlement, I do not believe the court can take away the rights of the residents within 500 feet to decide on new communications facilities which this is, it is not the subject of the previous court case. I think it is too bad that another tower will have to be built if they want to continue their operation but I would have to vote to deny this based on the legalities of the situation. [R. 557.] Mr. Zeidan, as noted above, had already taken the position that the siting of the ATC Tower had been a mistake, one that he did not support repeating.

The ZBA then unanimously voted to deny T–Mobile's request for a variance from Section 240–49(G)(5)(b)—apparently on the ground that, by granting a variance from the requirement that the signatures of residents within 500 feet be obtained, the Board would be overriding the law. [R. 558.] No one present commented on the fact that any request for a variance is a request to override the law—that is what a variance is.

At no time during the February 4, 2008 meeting did the ZBA address or discuss any of the factors specified in Section 240–92(C) (2), which must be considered when determining an area variance application. [R. 553–558.]

By letter dated February 6, 2008, T–Mobile was advised that the ZBA denied T–Mobile's request. The letter does not identify any basis or reason for the ZBA's decision. [R. 563.]

## PROCEDURAL HISTORY OF THIS LITIGATION

On March 5, 2008, T–Mobile filed the instant action. An amended complaint was filed on April 8, 2008.

T–Mobile brought a total of ten separate claims—eight under the TCA and two under state law. The federal claims seek a declaration that the TCA preempts certain provisions of the Town's Zoning Code; that the ZBA's decision denying T–Mobile's application for a variance so that it can co-locate on the ATC Tower is (1) not supported by substantial evidence, (2) predicated on forbidden considerations (to wit, the purported environmental effect of radio frequency emissions), (3) effectively constitutes a denial of service, and (4) unlawful in that it discriminates among service providers. The state law claims seek a declaration that T–Mobile should not have had to file for a variance because the proposed use (co-location) was a conforming use, as well as a declaration that the ZBA's failure to grant the requested variance was arbitrary and capricious in violation of Article 78 of the Civil Practice Law and Rules of the State of New York and New York's public necessity doctrine.

The Town answered the amended complaint, principally denying all charges and seeking dismissal of all claims.

As noted above, both sides moved for partial summary judgment in the summer of 2008. Plaintiffs move for the entry of a mandatory injunction compelling the Town Defendants to grant all necessary approvals so that it can co-locate and close its coverage gap as soon as possible. The Planning Board and Buildings Department argue that all claims against them should be dismissed because they have not yet issued any final decision; all defendants urge that this Court should conclude that substantial evidence supported the ZBA's variance decision and that the decision neither rested on impermissible factors nor violated state law.

The case was assigned to Judge Conner. It was reassigned to this Court upon Judge Conner's death in July 2009.

## DISCUSSION

Before discussing the merits of the various motions and cross-motions, a word on who are proper parties is in order.

■ Under Federal Rule of Civil Procedure 17(b), an entity is suable in federal court only if it would be suable under the laws of the state where it was created. *See Rowland v. Cal. Men's Colony, Unit II Men's Advisory Council,* 506 U.S. 194, 214, 113 S.Ct. 716, 121 L.Ed.2d 656 (1993). Therefore, the law of New York governs which entities can be named as defendants in this case.

■ In New York, agencies of a municipality are not suable entities. The only proper defendant in a lawsuit against an agency of a municipality is the municipality itself, not the agency through which the municipality acted. This is so because, "Under New York law, departments that are merely administrative arms of a municipality have no separate legal identity apart from the municipality and therefore cannot be sued." *Santiago v. City of N.Y.,* No. 06–15508, 2008 WL 2854261, at *3 (S.D.N.Y. July 21, 2008); *See also, e.g., Fanelli v. Town of Harrison,* 46 F.Supp.2d 254 (S.D.N.Y.1999); *Baker v. Willett,* 42 F.Supp.2d 192, 197 (N.D.N.Y.1999); *Manning v. County of Westchester,* No. 93–3366, 1995 WL 12579 at *2 (S.D.N.Y. Jan. 5, 1995); *Wilson v. City of N.Y.,* 800 F.Supp. 1098, 1101 (E.D.N.Y.1992).

In this case, plaintiffs sued the Town of LaGrange, its Buildings Department, its Planning Board and its Zoning Board of Appeals. The last three defendants are sued only as municipal entities; T–Mobile did not sue the individual members of those boards or the building inspector himself.

The various boards and departments have made arguments addressed to themselves as separate entities; for example, the Buildings Department and the Planning Board have argued that the entire complaint should be dismissed as against them because they have not taken any final action with regard to T–Mobile's collocation application.

However, such arguments need not be considered. For purposes of this lawsuit, the only proper municipal party defendant is the Town of LaGrange, and the only question is whether an injunction should issue against the Town (which would include all of its municipal entities).

## A. A Variance Was In Fact Required Before T–Mobile Could Co–Locate

It seems counter-intuitive, as T–Mobile repeatedly states, that it should need to obtain a variance from § 240–49(G)(5)(b) before it can co-locate wireless antenna on a tower that (1) has been declared to be a conforming use by order of this court, and (2) exists for the purpose of providing cell phone carriers with a means of providing service to the public.

Nonetheless, I agree with the Town that T–Mobile needed a variance before it could install its antennas.

■ The Nextel settlement was deliberately fashioned in a way that made the tower a conforming use, and made Nextel's placement of antennas thereon a conforming use, but that subjected any further build-out to whatever zoning restrictions were in place at the time application for permission to co-locate was made. The settlement order provides that "any new . . . additions to the [ATC] monopole . . . shall comply with any existing Town Zoning Code." [R. 78.] For different reasons, neither Nextel nor the Town had any interest is making it easy for other cell phone providers to enter or expand service in LaGrange. So the settlement they reached gave Nextel what it was looking for, leaving in place whatever impediments existed (or might later be implemented) to forestall, and perhaps deter, the next provider (and Nextel competitor) from using the ATC Tower.

Paragraph 4 of the Order does state that new applicants are free to challenge any Town law or regulation that might inter-

fere with a future addition or modification to the ATC Tower. But by affirmatively providing that new addition to the monopole had to comply with local zoning regulations, my esteemed late colleague, Judge Brieant, made it quite clear that the only "conforming uses" were the pole itself and Nextel's initial installation thereon. Even a future alteration or expansion by Nextel is made subject to the Town's Zoning Code!

The fact that all this seems counter-intuitive—especially in view of the Town Law that requires co-location unless an applicant can demonstrate that building a new facility will not solve a coverage problem—does not much matter. The Nextel settlement plainly left for another day (and, I am sorry to say, another judge) the resolution of all these issues in relation to any new application.

For that reason, plaintiffs' motion for partial summary judgment on its Ninth Cause of Action is denied and the Town's cross-motion for partial summary judgment dismissing the Ninth Cause of Action is granted.

This particular disposition renders moot the ZBA's application to dismiss the Ninth Cause of Action as against it on the ground that it lacked authority to answer T–Mobile's question posed in its letter dated January 18, 2008.

We now move on to the rest of T–Mobile's arguments—which have considerably more force.

**B. The ZBA's Denial of T–Mobile's Application Violates Section 332(c)(7) and Article 78 of the Civil Practice Law and Rules.**

1. *The Town's Denial of T–Mobile's Application Violates Section 332(c)(7)(B)(iii).*

Section 332(c)(7)(B)(iii) of the TCA states that "any decision by a State or local government or instrumentality thereof to deny a request to place, construct or modify personal wireless service facilities shall be in writing and supported by substantial evidence contained in a written record." The ZBA's denial of T–Mobile's application for a variance, on the basis of a record that contains no discussion of the relevant issues and in a letter that fails to articulate any reason for denying the application, is not based on substantial evidence. It violates the TCA in every possible way. And because it is not based on substantial evidence, it also cannot withstand review under Article 78 of New York's Civil Practice Law and Rules.

**(a) The Town Failed to Give Written Reasons for its Denial.**

"The TCA requires a written decision to enable a reviewing court to analyze the zoning authority's rationale and to determine if the agency complied with the TCA's requirements." *SBA Commc'ns, Inc. v. Zoning Comm'n of Franklin,* 164 F.Supp.2d 280, 290 (D.Conn. 2001) (citing *Western PCS II Corp. v. Extraterritorial Zoning Auth. of Santa Fe,* 957 F.Supp. 1230, 1236 (D.N.M.1997)); *see also City of Rancho Palos Verdes v. Abrams,* 544 U.S. 113, 128, 125 S.Ct. 1453, 161 L.Ed.2d 316 (2005) (Breyer, J., concurring) ("The statute requires local zoning boards ... [to] give reasons for denials 'in writing.' "); *Cellular Tel Co. v. Town of Oyster Bay,* No. 97–641, 1998 U.S. Dist. LEXIS 21500, at *16 (E.D.N.Y. June 17, 1998) ("[T]he substantial evidence test requires governing bodies to produce a written decision, detailing the reasons for the decision and the evidence that led to the decision ...." (internal quotation marks omitted)). "If the written decision does not set forth the zoning authority's rationale, this ground alone is sufficient to

quash the [zoning authority's] decision." *Smart SMR of N.Y., Inc. v. Zoning Comm'n of Stratford,* 995 F.Supp. 52, 56 (D.Conn.1998) (internal quotation marks omitted and alteration in original).

■ In addition, "A local zoning authority must issue a decision in writing ... linking its conclusions to evidence in the record." *Omnipoint Commc'ns, Inc. v. Planning & Zoning Comm'n of Wallingford,* 83 F.Supp.2d 306, 309 (D.Conn.2000); *see also Sprint Spectrum L.P. v. Town of N. Stonington,* 12 F.Supp.2d 247, 251 (D.Conn.1998) (collecting cases). "Otherwise, [a] court would have to wade through the record below in an attempt to discern the [zoning authority's] rationale." *Omnipoint Commc'ns, Inc. v. Planning & Zoning Comm'n of Guilford,* 156 F.Supp.2d 212, 221 (D.Conn.2001) (internal quotation marks omitted).

The ZBA's denial of T–Mobile's application, although written, failed to include any articulated rationale or written reasons for the denial. [R. 563.] Instead, the letter merely advised T–Mobile that its application had been denied, leaving it up to the imagination of T–Mobile (and this Court) to speculate as to why the ZBA chose to act as it did. The letter fails to cite to any evidence in the record or to link that evidence to its rationale or reasoning for the denial. [R. 563.] Indeed, since most of the record consists of comments from the public—some of which concerned matters that the ZBA was not legally permitted to consider, including the purported negative health effects from emissions from the cell tower, *see Smart SMR of New York, Inc. v. Zoning Comm'n of Stratford,* 995 F.Supp. 52, 58 (D.Conn.1998); *Sprint Spectrum LP v. Town of Farmington,* No. 3:97 CV 863, 1997 WL 631104, at *5, 1997 U.S. Dist. LEXIS 15832, at *13 (D.Conn. Oct. 6, 1997) (citing H.R. Conf. Rep. No. 104–458)—it is entirely possible that the Board members were swayed to vote as they did by the sort of legally-impermissible considerations that were the subject of many of the citizen comments they entertained.

The Town Defendants do not contest the irrefutable fact that the letter denying the variance gave no reason for the decision. However, they argue that the ZBA did not violate the TCA by declining to give reasons in its letter, since the "substantial evidence" supporting its decision can be gleaned from a review of the record.

This argument ignores the obvious. The law requires the ZBA to specify what its reasons were so that no one has to parse a record and guess which of the things mentioned therein was ultimately found persuasive. The Board did not do so; it thus violated the law.

This alone is reason to grant T–Mobile's motion for partial summary judgment on its Fifth Cause of Action and to deny the Town's cross-motion for summary judgment dismissing the Fifth Cause of Action. *See SBA Commc'ns, Inc.,* 164 F.Supp.2d at 290; *Cellco P'ship v. Town Plan & Zoning Comm'n of Farmington,* 3 F.Supp.2d 178, 184 (D.Conn.1998). However, there is no need to rely solely on a technicality to grant plaintiffs' motion. A review of the record that the Town urges the court to undertake reveals a more fundamental flaw-absolutely nothing can be found in the administrative record to support the ZBA's denial of the variance.

**(b) The Town's Denial of T–Mobile's Application Was Not Based on Substantial Evidence.**

■ The "substantial evidence" standard has been described as "less than a preponderance, but more than a scintilla of evidence. 'It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Omnipoint Commc'ns, Inc. v. Common Council of Peekskill,* 202 F.Supp.2d 210,

221 (S.D.N.Y.2002) (quoting *Universal Camera v. NLRB*, 340 U.S. 474, 477, 71 S.Ct. 456, 95 L.Ed. 456 (1951)). The standard is a deferential one. Federal courts "may neither engage in [their] own fact-finding nor supplant the [ ] Board's reasonable determinations." *Town of Oyster Bay*, 166 F.3d at 494. However, "denials subject to the TCA are reviewed by [a] court more closely than standard local zoning decisions," *Id.* at 493, and "the record should be viewed in its entirety, including evidence opposed to the Town's view." *Id.* at 494 (citing *Am. Textile Mfr. Inst., Inc. v. Donovan*, 452 U.S. 490, 523, 101 S.Ct. 2478, 69 L.Ed.2d 185 (1981)).

 Under New York law, "cellular telephone companies, such as [T–Mobile], are classified as 'public utilities' for purposes of zoning applications." *Common Council of Peekskill*, 202 F.Supp.2d at 222 (citations omitted). Therefore, "A zoning board of appeals has a narrower range of discretion in dealing with special permit applications filed by utilities than is true in the case of the generality of applications." *Id.* The applicable standard was articulated by the New York Court of Appeals in *Consolidated Edison Co. v. Hoffman*, 43 N.Y.2d 598, 611, 403 N.Y.S.2d 193, 200, 374 N.E.2d 105 (1978), which concerned the showing that a public utility must make under New York law before a zoning board may grant a use variance. *See also Cellular Tel. Co. v. Rosenberg*, 82 N.Y.2d 364, 371, 604 N.Y.S.2d 895, 898, 624 N.E.2d 990 (1993) (applying the *Consolidated Edison* test to cellular telephone company's application to build a new cellular site); *Nextel of New York, Inc. v. City of Mount Vernon*, 361 F.Supp.2d 336, 341 (S.D.N.Y. 2005).

 Under the Consolidated Edison "public necessity" standard, a utility must show that (1) its new construction "is a public necessity in that it is required to render safe and adequate service;" and (2)

"there are compelling reasons, economic or otherwise, which make it more feasible" to build a new facility than to use "alternative sources of power such as may be provided by other facilities." *Rosenberg*, 82 N.Y.2d at 372, 604 N.Y.S.2d at 899, 624 N.E.2d 990. Put another way, "a local board must evaluate a cellular telephone company's application for a variance on the basis of whether the public utility has shown a need for its facilities and whether the needs of the broader public would be served by granting the variance." *Sprint Spectrum, L.P. v. Board of Zoning Appeals of Town of Brookhaven*, 244 F.Supp.2d 108, 114 (E.D.N.Y.2003) (citing *Rosenberg*, 82 N.Y.2d at 371–72, 604 N.Y.S.2d 895, 624 N.E.2d 990.); *see also, e.g., Sprint Spectrum, L.P. v. Mills*, 65 F.Supp.2d 148, 156 (S.D.N.Y.1999). Further, "where the intrusion or burden on the community is minimal, the showing required by the utility should be correspondingly reduced." *Consolidated Edison*, 43 N.Y.2d at 611, 403 N.Y.S.2d 193, 374 N.E.2d 105. Thus, if the public utility makes the required showing the variance must issue. Whether the utility had made the requisite showing and whether the Board's negative decision is supportable by substantial evidence appear to be two sides of the same coin. *See, e.g., Nextel Partners, Inc. v. Town of Fort Ann*, 1 A.D.3d 89, 94–95, 766 N.Y.S.2d 712 (3d Dep't 2003) ("As Nextel has made the requisite showing to warrant the approval of its variance request, we conclude that the Town Board's denial of the application was arbitrary and not rational and was not supported by substantial evidence in the record.") As such, the Court has not yet found a case in which a court upheld the denial of a variance once the *Consolidated Edison/Rosenberg* standard was met.

 To establish necessity in this context, a wireless provider such as T–Mobile

must demonstrate that (1) there was a need for service; (2) its proposed installation was safe (with "safety" defined as being consonant with FCC emissions standards); and (3) the proposed action was more feasible than other options. *See Omnipoint Commc'ns, Inc. v. City of White Plains*, 430 F.3d 529, 535 (2d Cir.2005).

T–Mobile made that showing in connection with its application. T–Mobile submitted uncontroverted evidence clearly demonstrating that T–Mobile has a substantial gap in wireless services coverage in the Town of LaGrange and the surrounding area. [R. 561.] The application for co-location submitted by T–Mobile represented not only the most feasible option for filling that gap (short of erecting a new tower), but in reality the only option, given that the Town Law prohibits any new cell tower as long as co-location on an existing facility will solve the wireless service provider's problem. The installation meets FCC regulations, so by Congressional fiat it must be deemed safe.

The ZBA did not identify *any* evidence, let alone substantial evidence, to support its decision to deny T–Mobile permission to co-locate on the ATC Tower. The Court has reviewed the record. The reasoning (indeed, the entire discussion) of the members of the ZBA can be summarized as follows:

- Mr. Zeidan said that T–Mobile's application for co-location should have been taken care of three or four years ago; he was against it. He did not specify why he was against it;
- Mr. Johnson noted that there was a general requirement in the Town Code for co-location, but there was also a specific requirement that consent needs to be obtained from all persons who live within 500 feet of the apparatus, so there is a conflict "between a general and a specific issue" that the Board must recognize. He engaged in

no discussion of the fact that what the Board was being asked to do was to resolve the conflict by granting a variance from the latter provision in view of the former—which is the job of a ZBA;

- Ms. Swanson, while strongly believing in co-location, does not think the court settlement could take away the rights of the residents within 500 feet to decide on new communications facilities; it is too bad that another tower will have to be built, but she will vote to deny, "based upon the legalities of the situation." She, too, ignored the fact that the Board was being asked for a variance from "the legalities" of one of the provisions of the Zoning Code. No one mentioned the fact that New York law required a ZBA to grant such a variance;
- Mr. Johnson then moved to deny T–Mobile's request for relief from the Town Code provision that prohibits communications facilities within 500 feet of any occupied residential dwelling unless all inhabitants of that dwelling consent. He noted that the code provisions [for co-location and resident consent] appeared to conflict but concluded that the specific should override the general "recommendation."

Based on this the ZBA voted unanimously to deny.

It could not be clearer that the ZBA caved to continuing community ire that followed the Nextel settlement and the construction of the ATC Tower—ire that was expressed, verbally and in writing, during the ZBA hearings. The Board members justified their vote deny a variance from the consent requirement on the ground that the law contained a consent requirement—in other words, instead of deciding whether substantial evidence supported granting a variance from the con-

sent requirement, the ZBA simply fell back on the fact that a variance was required in order to deny it! The utterly absurd, completely circular "explanation" offered by the ZBA members for refusing to permit co-location *notwithstanding* the consent requirement (which is what the ZBA was asked to do—to grant a variance that would permit co-location without consent) demonstrates that there was no reasoned basis in the evidence for denying the variance.

The ZBA's lack of any rationale other than hostility to cell phone facilities by the community is underscored by (1) the Board's lack of any reference to the evidence presented by T–Mobile; and (2) the lack of any discussion of the kinds of issues that are appropriately discussed when seeking an area variance; and (3) a Board member's frank acknowledgement that the settlement of the Nextel litigation had been a mistake that the ZBA had no intention of repeating by permitting T–Mobile to co-locate on the ATC Tower.

The absence of any discussion of the criteria that must be considered when ruling on an application for an area variance—which are set forth in the Town Code at § 240–92 (Valk Aff. Ex. C)—is particularly telling. This section of the Town Code compels the ZBA, in making its determination, to take into account the benefit to the applicant if the variance is granted, as weighed against the detriment to the health, safety and welfare of the neighborhood or community if the variance is granted. Of course, the Planning Board, by granting the negative SEQRA Declaration, had already determined that there was no negative impact on the health, safety and welfare of the neighborhood or community. This probably explains why the Board made no mention of the Town Law factors and did nothing to weigh the lack of negative impact (as

found by the Planning Board) against the benefit to T–Mobile (which is obvious).

Additionally, the ZBA is required by law to consider each of the following factors:

(a) whether granting the variance will work an undesirable change in the neighborhood;

(b) whether the applicant can achieve the benefit in some other way;

(c) whether the requested area variance is substantial;

(d) whether the variance will have a negative environmental effect;

(e) whether the alleged difficulty was self-created;

Obviously, if the ZBA had considered those factors, it would have had no choice but to grant the variance. The variance would work no change whatever in the neighborhood; there is already a cell tower in place, with antennae protruding therefrom—co-location of the T–Mobile equipment on the existing tower would cause no new injury to the aesthetics or property values of the neighborhood. There is no other means for T–Mobile to fill its coverage gap, since as long as co-location on an existing facility (and the ATC Tower is the only such facility) will fill the gap, it cannot make the showing required under the Town Code to build a new cell tower. The requested variance is insubstantial; T–Mobile's antennae would not add to the height of the tower and would not broaden its impact. The Planning Board already found that there would not be any environmental impact from co-location. And T–Mobile's coverage gap is not a self-created problem.

In short, every single factor that the ZBA *must* consider when confronted with an application for an area variance pointed in the direction of granting the request.

The only item in the administrative record that the Town might point to as "evi-

dence"—because it is the only thing in the record other than T–Mobile's application—is public comment opposed to T–Mobile's application to collocate at the ATC Site. *But public officials are supposed to carry out the mandate of the TCA and state law in the face of community opposition.* The unsubstantiated concerns of the general public—especially on a matter that has been expressly preempted by federal law—do not constitute "substantial evidence." Indeed, "New York courts have held that a zoning board may not deny a special permit solely on the basis of generalized objections and concerns 'which, in effect, amount to community pressure.'" *Common Council of Peekskill,* 202 F.Supp.2d at 222 (quoting *Twin County Recycling Corp. v. Yevoli,* 224 A.D.2d 628, 629, 639 N.Y.S.2d 392, 393 (App.Div., 2d Dep't 1996)).

Because there record reveals *no* evidence to support denial of the variance, let alone substantial evidence, the Court concludes that all the ZBA did here was succumb to community pressure in violation of the law.

T–Mobile has more than met its burden under New York's "public necessity" doctrine, and in light of the record facts, the ZBA was effectively required, under New York law, to grant T–Mobile the requested variance. Its failure to do so means that the Town acted without the substantial evidence required by the TCA. Therefore, plaintiffs are entitled to summary judgment on their Fifth Cause of Action, and the Town Defendants' cross motion for summary judgment dismissing that claim must be denied.

### 2. The Town has also Failed to Meet its Burden under CPLR Article 78

The Town's failure to put forth substantial evidence in support of its denial also means that plaintiffs' motion for summary judgment on their Tenth Cause of Action must be granted, and defendants' corresponding cross-motion denied.

■ It is well established under New York law that the determination of a municipal board will be set aside on the basis of arbitrariness, or where it is not supported by substantial evidence. *See Independent Wireless One Corp. v. City of Syracuse,* 12 A.D.3d 1085, 1086, 784 N.Y.S.2d 473, 473 (App. Div. 4th Dep't 2004) (affirming judgment directing issuance of use variance where denial was "arbitrary and not rational" and "not supported by substantial evidence in the record"); *Nextel Partners, Inc. v. Town of Fort Ann,* 1 A.D.3d 89, 94–95, 766 N.Y.S.2d 712, 718 (App. Div.3d Dep't 2003) (same). Although the board retains some discretion to evaluate each application, to determine whether applicable criteria have been met, and to make common sense judgments as to whether the application should be granted, such determination must be supported by substantial evidence. *See Twin County Recycling Corp. v. Yevoli,* 90 N.Y.2d 1000, 1002, 665 N.Y.S.2d 627, 628, 688 N.E.2d 501 (1997). "[T]he board may not base its decision on generalized community objections." *Id.*

■ "The test for 'substantial evidence' in New York is essentially the same as that under the TCA." *Common Council of Peekskill,* 202 F.Supp.2d at 226. The refusal of the ZBA to apply the Town's own code to T–Mobile's application is the quintessence of an arbitrary and capricious action, because the decision is not supported by *any* evidence, let alone substantial evidence. As previously discussed, the ZBA failed and refused to consider any of the factors it was legally required to consider, while grounding its decision in nonsensical reasoning that fails to mask the real reason for its determination: community consternation over the previously erected ATC Tower.

The order of the ZBA is hereby over-turned, under both federal and state law.

3. *The Town's Denial of T–Mobile's Application Has the Effect of Prohibiting the Provision of Wireless Services in Violation of Section 332(c)(7)(B)(i)(II)*

 A municipality cannot prohibit, or make decisions that have, the effect of prohibiting, personal wireless services. *See* 47 U.S.C. § 332(c)(7)(B)(i)(II). The Second Circuit has interpreted this section to "preclude[ ] denying an application for a facility that is the least intrusive means for closing a significant gap in a remote user's ability to reach a cell site that provides access to land-lines." *Sprint Spectrum, L.P. v. Willoth,* 176 F.3d 630, 643 (2d Cir.1999). "In other words, local governments must allow service providers to fill gaps in the ability of wireless telephones to have access to land-lines." *Id.*

By choosing to co-locate antennas on an existing tower, T–Mobile has chosen both the least intrusive means to fill a significant gap in coverage, as well as the means that complies with the Town's co-location preference as stated in its Code. Indeed, in view of the Town's legislated preference for co-location, T–Mobile has chosen the *only* possible means of filling the coverage gap. It is, therefore, mandatory that the Town grant plaintiffs a variance from the "public consent" statute.

(a) *There is a significant service gap in T–Mobile's wireless network.*

The overwhelming weight of the evidence demonstrates that T–Mobile has a substantial gap in coverage in the Town of LaGrange and the surrounding area: In fact, the record is devoid of any evidence to the contrary.

Propagation maps prepared by a radio frequency engineer, which depict the gap in coverage, were submitted by T–Mobile in connection with its initial application.

[R. 229–230.] However, T–Mobile's engineers subsequently re-calibrated their propagation tool, which resulted in the creation of updated maps. [R. 561–562.] The updated maps were submitted to the ZBA and discussed during the February 4, 2008 meeting. [R. 553.]

As shown in the first of the maps contained at pages 561–62 of the administrative record, there is a complete absence of coverage over a 3.5–mile area along State Route 55 and in the center of the Town of LaGrange. The areas depicted in green and yellow have coverage to varying degrees (*i.e.,* in-building or in-vehicle). The blank area in the middle of the map is the 3.5 mile significant gap that T–Mobile is seeking to close. The point marked "ATC" in the approximate center of the map is a reference to the ATC Site that is the subject of T–Mobile's collocation application and this litigation.

The second map depicts how T–Mobile's coverage gap would be eliminated by collocation of its wireless services facilities at the ATC Site. Co-location eliminates the area that was previously without coverage. At no time during the underlying proceedings did the Town contest the depicted gap in coverage. The existence of a significant gap in T–Mobile's coverage is undisputed.

(b) *Co-location at the ATC Site is the least intrusive means for closing the gap.*

The least intrusive means to fill a significant gap in wireless coverage is to co-locate antennas on an existing structure. The ATC Tower will remain in place regardless of whether T–Mobile co-locates its antennas on the structure. Photo simulations submitted to both the ZBA and the Court [R. 269] demonstrate that the intrusiveness of collocating T–Mobile's antennas on the tower can be described as minimal, at worst. [R. 269.] Since the ATC Tower is a given, there is no rational

basis for concluding that aesthetic considerations will be offended; T–Mobile's apparatus will not either heighten or broaden the existing tower. *See Nextel Partners, Inc. v. Town of Amherst*, 251 F.Supp.2d 1187, 1196 (W.D.N.Y.2003).

T–Mobile's only available alternative is to find a site where it could *build* a new tower to an adequate height for the sole purpose of placing its antennas on the structure. However, the Town's own telecommunications regulations unequivocally require that wireless providers co-locate antennas on existing structures, rather than build something new. Indeed, as previously discussed, Section 240–49(G)(10)(b) *requires co-location* unless an *applicant* provides clear and convincing evidence that: (1) no other usable structures exist; (2) co-location does not achieve minimum technical needs; (3) structural or engineering limitations exist; or (4) permission for collocation is denied after thorough and good faith efforts. The Chairman of the LaGrange Planning Board made this abundantly clear on January 22, 2008, when that Board determined that co-location would not result in any significant adverse environmental impact; *the Planning Board Chairman stated on the record that T–Mobile could never obtain permission to build a new tower, because the Town Code requires an applicant for permission to build a new tower to demonstrate that an existing tower would not provide the needed coverage, and all the evidence demonstrated that T–Mobile could get the coverage it needed by co-locating on the existing ATC Tower.* [R. 527] And in fact, T–Mobile's evidence negated every single conclusion that the Town would need to reach before allowing the provider to build a new tower on the Redl Site: (1) a useable structure exists; (2) co-location meets its technical needs; (3) the ATC Tower can adequately support T–Mobile's antennas; and (4) an existing lease between T–Mobile and ATC permits co-location.

By denying T–Mobile a variance from the requirement that it obtain the unobtainable—consent from all nearby residents—so that it could use the only legally available means to fill its coverage gap, the Zoning Board made it effectively impossible for T–Mobile to close that gap. Without a variance, T–Mobile cannot co-locate; but because T–Mobile can never meet the evidentiary requirement of the Town's strict co-location ordinance (§ 240–49(G)(10)(b)), it can never build a new tower, either. In other words, the two Town Boards can effectively whipsaw T–Mobile to prevent it from adding coverage to an underserved area by relying on a potential conflict (which in this case is fully realized) in two different provisions of the Zoning Code. Defendants can protest until every Town official is blue in the face that the Town "cannot" legally prevent T–Mobile from filling the coverage gap, but actions speak louder than words: that is exactly what the Town has done and continues to do.

The ZBA's denial of T–Mobile's application has left T–Mobile with no feasible means of filling the gap, short of building a new tower that it cannot build under existing Town Law—and if it could build such a tower, it would take years to seek and receive the necessary permits and approvals. This situation clearly has the effect of prohibiting wireless services within the Town, in violation of the TCA.

Therefore, plaintiffs' motion for partial summary judgment on their Sixth Cause of Action is granted; and defendants' corresponding cross motion for dismissal of that claim is denied. *See Nextel Partners, Inc. v. Town of Amherst*, 251 F.Supp.2d 1187, 1196 (W.D.N.Y.2003) (granting summary judgment on effective prohibition of services claim); *Omnipoint Commc'ns,*

*Inc. v. Vill. of Tarrytown Planning Bd.,* 302 F.Supp.2d 205, 219 (S.D.N.Y.2004) (same).

**4.** *The Town's Denial of T–Mobile's Application Has the Effect of Unreasonably Discriminating in Violation of Section § 332(c)(7)(B)(i)(I).*

 The TCA provides that any state or local government regulation of the placement, construction and modification of personal wireless services facilities shall not unreasonably discriminate among providers of functionally equivalent services. *See* 47 U.S.C. § 332(c)(7)(B)(i)(I). Consequently, a plaintiff must show that a defendant discriminated among providers of functionally equivalent services and that the providers were treated unequally. *See Nextel Partners of Upstate N.Y., Inc. v. Town of Canaan,* 62 F.Supp.2d 691, 698 (N.D.N.Y.1999). Although the TCA explicitly contemplates that some discrimination among providers of functionally equivalent services is allowed, such discrimination must be reasonable. *See Willoth,* 176 F.3d at 638; *AT & T Wireless PCS, Inc. v. City Council of Va. Beach,* 155 F.3d 423, 427 (4th Cir.1998); *Smart SMR,* 995 F.Supp. at 59. In this instance, the Town's discrimination against T–Mobile is unreasonable and violates the TCA.

Nextel provides services that are functionally equivalent to those provided by T–Mobile. As previously discussed, Nextel is providing those services within the Town, and specifically through the use of its antennas that are installed on the ATC Tower. [R. 375.] Therefore, by wrongfully denying T–Mobile's application to co-locate at the same location and preventing T–

Mobile from providing wireless services that are functionally equivalent to those provided by Nextel, the Town has unreasonably discriminated against T–Mobile in violation of the TCA. Doing so has created an unlawful competitive advantage in favor of another wireless provider, namely Nextel[5]

For this reason, T–Mobile is entitled to partial summary judgment on its Eighth Cause of Action and defendants' corresponding motion for partial summary judgment dismissing the claim is denied.

**C. Necessary Approvals and Permits to T–Mobile Must Issue Immediately.**

 "Courts have consistently held that a mandatory injunction is an appropriate remedy for violations of the TCA." *Town of Amherst,* 251 F.Supp.2d at 1200 (collecting cases); *see also Town of Oyster Bay,* 166 F.3d at 497 (recognizing that, although the TCA does not specify a remedy for violations of the cellular siting subsection, a majority of district courts have held that the appropriate remedy for such violations is injunctive relief in the form of an order to issue the relevant permits); *Common Council of Peekskill,* 202 F.Supp.2d at 227 (holding that the appropriate remedy for a violation of the TCA is "immediate injunctive relief directing the issuance of a special permit, building permit and any other applicable permits or approvals necessary for [the plaintiff] to construct and operate its personal wireless service facility").

 The facts and circumstances of this case make clear that a mandatory injunction is required. Until now, T–Mo-

---

**5.** It is theoretically possible that the Nextel settlement violates the TCA insofar as it exempts Nextel from the "permission from the neighbors" provision of the Zoning Code but explicitly makes every other service provider subject to that extremely onerous provision.

However, I need not resolve that issue in order to dispose of this case; I need only find that, as applied to T–Mobile, there is an unwarranted discrimination, which the Town may not countenance or exploit. I so find; it would be impossible to conclude otherwise.

bile has been bounced back-and-forth like a ping pong ball between the Planning Board and the ZBA. During the course of those proceedings, T–Mobile has made everyone involved well aware of their responsibilities and obligations under the TCA and the applicable state law, as well as the Town's own code. Yet Town representatives, giving in to improper public pressure, have chosen to disregard the law and wrongfully deny T–Mobile's application. The Record demonstrates that T–Mobile has been stymied at every turn by the improper acts of the Town. It is obvious to this Court that further review by either the Planning Board or the ZBA would serve no purpose and would greatly prejudice T–Mobile by further delaying its ability to close the gap in its wireless services network. Therefore, an immediate mandatory injunction shall issue.

The Town argues that cannot issue the injunction sought by T–Mobile, but instead must limit any injunction to that which directs the ZBA to issue the area variance that was the subject of its denial. In its motion for partial summary judgment dismissing certain claims, the Town attempts to defuse this argument by suggesting that certain of the defendants (i.e., the Building Department and the Planning Board) have not done anything wrong, so plaintiffs have not demonstrated that remand would be futile. In doing so, the Town places great emphasis on its position that there has been no delay on its part during the course of the municipal proceedings, and it submits that remand for further proceedings will serve a "useful purpose."

The Court disagrees. Remand to the Planning Board would be both futile and inappropriate. There is considerable evidence of past delay on the Town's part and the only "useful purpose" that would be served by remand is the "useful purpose" of allowing local officials to delay the inevitable for as long as possible

The animosity of the Town (and its residents) towards the wireless communications tower predates any application by T–Mobile. Like T–Mobile, ATC/Nextel was left with no choice but to commence an action challenging the denial, which delayed the construction of the ATC tower for many years. The lawsuit was settled on terms that should have led to the immediate construction of the tower. But as the record demonstrates, ATC diligently pursued issuance of a Certificate of Compliance by the Town. Despite its efforts, it took nearly a year-and-a-half for the Town to issue the Certificate of Compliance for the ATC Tower. [R. 374.] The Town finally issued a Use Permit to Nextel more than *three years* after this Court issued an Order authorizing the installation of the ATC Tower and collocation of Nextel's antennas. [R. 375, 76–79.] None of that delay in getting the ATC Tower up and running can be attributed to T–Mobile; neither can plaintiffs be penalized for making the sensible-decision not to throw good money after bad by actively pursuing their applications (whether for a new tower or for co-location on ATC's tower) while the ATC issues were thrashed out.

For a (very) short while it appeared that T–Mobile's application for co-location on the ATC Tower—which conformed to the Town's preference, as expressed in its Zoning Code—would sail through. In fact, eight days prior to the first scheduled public hearing, the Building Department, presumably on behalf of the Planning Board, requested five copies of the site plan with signature blocks for the Planning Board members so they would be available for execution at the conclusion of the January 17, 2006 meeting. [R. 280–286.]

But that did not happen: once the Planning Board opened the public hearing, it was deluged with public comment opposing the continued existence of the ATC Tower

and, by consequence, T–Mobile's collocation application. [R. 330–333.] Angered by the Town's settlement of the ATC Litigation, public comment pertained to alleged concerns regarding health effects of cell towers, the visual impact of the ATC Tower, the fall down area of the ATC Tower, maintenance concerns with the ATC Tower, and perceived non-compliance issues with the ATC Tower vis-a-vis the ATC Order and the Town's Code. [R. 330–333.] Instead of closing the public hearing and approving the co-location application at the conclusion of the meeting as anticipated, the Planning Board adjourned the public hearing so that some of the residents' concerns with the ATC Tower (not with T–Mobile's application) could be investigated and addressed. [R. 333.]

Two months later—nearly one year after T–Mobile submitted its co-location Application—the Town officially changed its position. In a letter dated April 3, 2006, the Director of the Building Department advised T–Mobile that he had "reconsidered" T–Mobile's collocation application and had "reviewed" the situation with "the Town's legal counsel." [R. 358–360.] This "reconsideration" and "review" led to the identification of five new "conclusions"— none of which had previously been mentioned or identified as potential issues, either during T–Mobile's two prior appearances before the Planning Board or in discussions with Building Department representatives. It was in this context that the demand for a variance was required from Section 240–49(5)(b)'s "inhabitant consent" provision was first raised. While I disagree with T–Mobile that no such variance was needed, it is highly significant that no one from the Town mentioned the need for such a variance until after community ire surfaced at the public meeting.

Less than a week after the ATC Tower issues had been resolved, T–Mobile submitted a letter to the Building Department asking to appear before the Planning Board for continuation of its application, and it did so during the September 4, 2007 meeting. [R. 377.] During the meeting, both the Planning Board and the Director of the Building Department encouraged T–Mobile to resurrect its defunct application to build a new tower at the Redl Site, rather than pursuing the proposed collocation at the ATC Site. It could not be plainer that the Planning Board was trying to direct T–Mobile to the Redl Site because the entire process would have to begin again, delaying the installation of T–Mobile's needed equipment for years.

Furthermore, as the Chairman of the Planning Board acknowledged only five months later, on January 22, 2008, any Redl application was doomed as a matter of law because co-location—the Town's legislatively-preferred solution—is feasible on the ATC Tower. Nothing in the record suggests that the Town has amended or eliminated the provision of the Zoning Code that that makes co-location on the existing ATC Tower the only legally feasible solution to T–Mobile's coverage problem. Neither is there the slightest suggestion in the record that the Town Board would ever take such a step, in the face of continuing community opposition to any cellular installation anywhere.

Indeed, if the Court were to enter an injunction that did no more than compel the ZBA to grant the requested variance, the Town has recently taken steps that would make further proceedings on remand more complicated. In what can hardly be considered a coincidence, on February 20, 2008 (i.e. two weeks after the ZBA denied T–Mobile's area variance request), the Town Board enacted Local Law 1 of 2008, which adds a requirement that any application for co-location include the tower owner (*e.g.*, ATC) as a co-applicant.

In other words, if this matter were remanded to the Town, T–Mobile would have to resubmit its-co-location application in its entirety, only this time with ATC as a co-applicant![6] ATC, which has already built its tower, would hardly participate in this exercise willingly (or without receiving some consideration from T–Mobile, perhaps in the form of having its expenses paid). This new law is just another roadblock for T–Mobile to try to surmount, adding to the time and expense involved in filling the existing coverage gap—something that federal law not only permits, but requires.

And at the end of the day, T–Mobile's new application would have to be turned down, because plaintiffs could not demonstrate that they were exempt from the co-location requirements of § 240.49(F). Indeed, by obtaining an injunction that compels the ZBA to issue a variance from the "community consent" requirement, T–Mobile has eliminated any possibility of successfully arguing that it is not feasible to co-locate on the ATC Tower! And of course it cannot "co-locate" on a "Redl Tower" because no such tower has yet been built—or will be for many years, if ever.

As the foregoing makes clear, the Town as a whole, through its various Boards and Departments, has engaged in a lengthy and concerted effort to prevent or at least to delay as long as possible, T–Mobile from eliminating the uncontroverted coverage gap.

The Town's arguments in support of remand for further proceedings—its claims that the Planning Board and Buildings Departments (1) have not made a "final determination," (2) have not engaged in any delay, and (3) have not "predeter-mined" the fate of T–Mobile's application—are disingenuous.

The Planning Board has already made the only determination it needs to make. It determined as long ago as January 2008, when it made its negative SEQRA Declaration, that there were neither health and welfare nor other environmental reasons to deny co-location. Its chairman also announced that T–Mobile could not satisfy the legal requirements for obtaining permission to build a new cell phone tower. None of that has changed today.

It appears to the Court that most of the delay in dealing with T–Mobile's application has been a product of the Town's recalcitrance—recalcitrance to allow construction of the ATC Tower even after entering into a settlement that mandated its construction and recalcitrance in delaying T–Mobile's co-location application in order to deal with issues relating to the Tower, not T–Mobile.

Finally, the foregoing unrefuted facts make it clear to an outsider that any issues that might be raised on remand (and no such issues are identified) are undoubtedly "predetermined" against the interests of T–Mobile. Notwithstanding the apparent position of the ZBA, it is clear that both the Building Department and the Planning Board have changed their position on T–Mobile's co-location application due to the significant public outcry and are destined to delay or deny any applications from T–Mobile for permits or approvals necessary to collocate on the ATC Tower. While the Planning Board was once prepared to sign off on T–Mobile's application, that is clearly no longer the case. Indeed, during the public hearing portion of the February 4, 2008 ZBA meeting, Alan Bell—the very

---

**6.** This law was not part of the administrative record but it is of obvious import on the question of the appropriate scope of the remedy to be entered by the Court. It is, therefore, appropriately part of the record in this lawsuit. It can be found attached as Exhibit A to the accompanying Declaration of Jon P. Devendorf dated August 15, 2008.

Chairman of the Planning Board who had acknowledged only weeks earlier that T–Mobile could not meet the legal requirements for building a new cell tower in LaGrange—"urged the [ZBA] rather strongly to turn [T–Mobile's co-location] application down." [R. 556.] On the record before the Court, there is not the slightest prospect that the Planning Board will do its duty in the absence of a court order compelling it to do so. And the passage of a new law that will effectively require T–Mobile to return to square one (albeit with a variance from the community consent requirement) demonstrates that the Town Board is also prepared to throw up whatever obstacles it can to T–Mobile's installation.

In short, the time has come for the court to compel LaGrange's public officials to do what the law requires.

The Town does not dispute that, "Courts have consistently Held that a mandatory injunction is an appropriate remedy for violations of the TCA." *Nextel Partners, Inc. v. Town of Amherst*, 251 F.Supp.2d 1187, 1200 (W.D.N.Y.2003) (issuing mandatory injunction based on conclusion that "further review by defendants would serve no useful purpose and would greatly prejudice Nextel by further delaying its ability to provide service to the public in a non-covered area"). The law in this Circuit is clear that "injunctive relief best serves the TCA's stated goal of expediting resolution of this type of action." *Town of Oyster Bay*, 166 F.3d at 497; *see also Common Council of Peekskill*, 202 F.Supp.2d at 227 ("Through its persistent evasive conduct, its disregard of clearly established New York law and its partisan statements and actions, the Common Council has relinquished its right to seek further review of Omnipoint's application."); *SBA Commc'ns, Inc. v. Zoning Comm'n of Franklin*, 164 F.Supp.2d 280, 294 (D.Conn. 2001) ("this action will not be remanded

back to the Commission because it would frustrate the TCA's intent to provide the aggrieved parties full relief on an expedited basis.").

The Court finds that there is no reason for further review of this project. It is the only possible solution to T–Mobile's coverage gap that is legally feasible under the Town's Zoning Code. The Town has demonstrated, and will continue to demonstrate, if not enjoined, that it will do everything in its power to keep T–Mobile from filling the gap, notwithstanding defendants' acknowledgement that the law compels them to let the gap be filled. The matter will be delayed endlessly if it cannot be turned down entirely. If this is not a case where a mandatory injunction should issue, then I cannot imagine when one should.

## CONCLUSION

For the reasons stated above, the motion by defendants to dismiss the Ninth Cause of Action is granted and the rest of defendants' motion for summary judgment (Dkt. # 24) is denied. The motion by plaintiffs for judgment in their favor on the Ninth Cause of Action is denied. Plaintiffs' motion for summary judgment (Dkt. # 20) is otherwise granted.

Plaintiffs are directed to submit to the court within five business days a form of order for an injunction to issue; defendants will have two business days thereafter to submit comments or an alternative form of order. This will be a permanent injunction.

The compendium of letters found at docket entry number 43 is hereby stricken from the docket. I am sending the copy I found in Judge Conner's file to defendants' counsel. They should not be part of the record on any appeal that may be taken to the Second Circuit.

The case will be conference on September 17 at 10:15 so we can decide what to do with the rest of the claims in suit, all of which are directed to declaring certain sections of the LaGrange Town Law unconstitutional as preempted by the TCA.

Finally, as should be apparent from the foregoing, this Court will not be granting any stay from its injunction to allow for an appeal. In the Court's opinion, any appeal from the permanent injunction that will be entered on the basis of this opinion would be frivolous, and I am not prepared to participate in further delay in the co-location of T–Mobile's antennas. I make this clear now so that the Town can arrange to apply to the Court of Appeals if it believes that a stay should issue pending what I trust will be an expedited appeal.